360 So.2d 399 (1978)
Donna Barnett KNAUER, Nadia Nightingale Allen, Downing Nightingale, Jr., Yvonne Barnett West, Caroline Barnett Bryan, Jane Claudia Barnett Gordon and Madeleine Camp Franklin, Petitioners,
v.
Charles BARNETT and William R. Barnett, Trustee, Respondents.
No. 50504.
Supreme Court of Florida.
June 8, 1978.
*400 Jack F. Wayman, Jacksonville, for petitioners.
C. Harris Dittmar of Bedell, Bedell, Dittmar & Zehmer, Jacksonville and Raymond, Wilson, Conway, Barr & Burrows, Daytona Beach, for respondents.
SUNDBERG, Justice.
This cause is a petition for writ of certiorari to review a decision of the District Court of Appeal, First District, reported at 336 So.2d 1213, which is alleged to be in conflict with In re McCollum's Estate, 88 So.2d 537 (Fla. 1956) and Taylor v. Taylor, 279 So.2d 364 (Fla. 4th DCA 1973).[1] Conflict is predicated upon the issue of whether *401 the paternity of a child who has been legitimatized by both a written, attested acknowledgment and intermarriage of his parents pursuant to the provisions of Section 731.29(1), Florida Statutes (1973), is subject to attack by the collateral kindred of the child's father.
William R. Barnett, respondent/trustee here, sought a declaratory judgment in the Circuit Court for Duval County, Florida, to determine the parties entitled to receive the income and corpus of a trust previously held for the benefit of William L'Engle Barnett (hereinafter referred to as William Barnett). Under the terms of a trust document executed by William in 1959, the income and corpus are distributable to the surviving "blood issue" of William Barnett or to the collateral kindred of William if no blood issue exists. Charles Barnett, who claims to be the son and blood issue of William, was a defendant in the suit below and is a respondent in the instant proceeding. The collateral kindred of William, who claim that he had no blood issue and, consequently, that they are entitled to the trust property, are petitioners here. The issue before the lower courts and here is whether Charles is the blood issue of William under a construction of Section 731.29(1), Florida Statutes (1973), which provides:
Every illegitimate child is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father. Such illegitimate child shall inherit from his mother and also, when so recognized, from his father, in the same manner as if the child had been born in lawful wedlock. However, such illegitimate child does not represent his father or mother by inheriting any part of the estate of the parents' kindred, either lineal or collateral, unless his parents have intermarried, in which event such illegitimate child shall be deemed legitimate for all purposes.
The trial judge construed the statute to render the parentage of Charles a factual issue to be resolved in the declaratory judgment proceeding even though William had executed a written, attested document acknowledging himself to be the father of Charles and had married Charles' mother, Marcelle. The judge concluded that because the provision refers to subsequent intermarriage of the parents, such means the child's natural (biological) parents, thereby leaving open to future adjudication the question of whether the acknowledging and marrying "father" was, in fact, the natural parent of the child. The decision of the district court under review recites the evidence upon which the circuit judge based his finding that Charles is not the blood issue of William:
Charles Barnett was born in Paris, France, on May 28, 1913, to Marcelle Perron, who was then 19 years old according to the official French record of his birth. On June 12, 1913, he was baptized in the Church of the Parish of St. Sulpice, Archbishopry of Paris, and his baptism was noted in the church's Baptismal Register with the space for his father's name left blank. In both the official civil and church records, Charles was originally identified as "Charles Perron."
On August 13, 1918, William L'Engle Barnett and Marcelle appeared before Deputy Mayor Christie of the 17th District of Paris and declared in the presence of witnesses that they "recognize as their son" the child Charles, born to Marcelle on May 28, 1913. An official entry of this act of recognition was made in the birth records of the 17th District of Paris and was signed by William, Marcelle, two witnesses and the Deputy Mayor. Four days later, on August 17, 1918, William and Marcelle appeared again before Deputy Mayor Christie, and he performed their lawful marriage, recording it in the official records. At the time of the marriage, Deputy Mayor Christie delivered to William the "Livret de Famille" the official family booklet required by French law to be retained by the head of each family as the official record of the family members. In that booklet, Deputy Mayor Christie officially recorded the marriage of William and Marcelle on August 17, 1918, and the birth of their child Charles *402 on May 28, 1913, affixing his seal and signature.
On July 1, 1920, William and Marcelle caused Charles' official birth record to be corrected to change his name from Charles Perron to Charles Barnett. The French official corrected the original birth record by striking through the name "Perron" and writing above it the name "Barnett" and by writing on the original birth record the following:
"Recognized the 13 August 1918, at the courthouse of the 17th district of Paris by William Barnett & Marcelle Amelie Anna Perron"
and
"Legitimized by marriage of William Barnett & of Marcelle Amelie Anna Perron, celebrated at the courthouse of the 17th district of Paris, the 17 August 1918."
On September 10, 1921, William and Marcelle caused the Baptismal Register of the Church of the Parish of St. Sulpice to be rectified to show "William Barnett" as the father of Charles and to change the name in the record from "Charles Perron" to "Charles Barnett." The change was made by striking through the name "Perron" and writing above it the name "Barnett" and by noting on the original record that it has been "rectified at the archbishopry on the 10 Sept. 1921." Also on September 10, 1921, William and Marcelle obtained a certificate from the Secretary of the Archbishopry certifying the baptism on June 12, 1913, of Charles, born May 28, 1913, the son of William and Marcelle.
On October 2, 1922, William and Marcelle placed Charles in the College Chaptal in Paris, where he received his formal education at their expense until November 7, 1928. During part of that time, William and Marcelle lived in Paris, and Charles lived with them.
On June 5, 1926, William was issued an identity card by the Paris police which showed him to be an American citizen with a Paris residence, and listed Marcelle as his spouse and Charles, born 1913 in Paris, as his child. A similar identity card was issued at the same time to Marcelle.
On November 7, 1928, Charles left France, traveling with William and Marcelle, and arrived in the United States on November 13, 1928. The three then drove from New York to William's home in Tangerine, Florida. Upon his arrival in Florida, Charles was registered in the Mt. Dora High School as the son of William L'Engle Barnett of Tangerine from which he graduated in the spring of 1930. In September, 1930, William took Charles to Gainesville and enrolled him in the University of Florida paying his tuition and living expenses. Between November, 1928, and September, 1930, Charles lived with William and Marcelle in the family home in Tangerine.
On August 25, 1933, William and Marcelle swore before a notary public that a petition prepared for filing with the French government was true in stating that Charles had been "acknowledged by the said William L'Engle Barnett as his son." This was for the purpose of obtaining Charles' release of allegiance to the French government preparatory to establishing his United States citizenship. On July 16, 1934, William and Marcelle executed a sworn affidavit for filing with the governments of the United States and France referring to Charles Barnett as "their son" and stating that Charles Barnett had been "acknowledged by the said William L'Engle Barnett as his son." On February 9, 1935, William signed his name in the blank for "father" on Charles' passport application and swore, before a Deputy United States Court Clerk, in an affidavit of birth to be submitted with Charles' application for passport, that Charles "is my son." 336 So.2d at 1215-16.
The evidence also revealed that Charles and his parents became estranged around 1940 due, in part, to the marriage of Charles to a woman of whom his parents did not approve. During this period of estrangement, which continued until William's death, William began referring to *403 Charles as his "adopted son" or "step-son" and purportedly stated that "[t]here's not a drop of my blood in that boy."
On appeal, the district court reversed and remanded the cause, finding that the circuit judge had erroneously construed Section 731.29(1), supra:
This construction in our view nullifies the obvious intent of the statute which was to lay at rest the question of legitimacy when the reputed father acknowledges the child before a witness and marries the mother. We do not believe it was the legislative intent to leave this question dangling for future litigation many years later (usually at the death of the father) when the problem of proof, though it could be difficult enough at the time of acknowledgment and marriage, would be far more difficult in later years. In this connection, § 742.091, Fla. Stat. (1973), a part of the bastardy statute, should be considered in pari materia with § 731.29(1), supra. § 742.091 states as follows:
"If the mother of any bastard child and the reputed father shall at any time after its birth intermarry, the child shall in all respects be deemed and held legitimate, and upon the payment of all costs and attorney fees as determined by the court, the cause shall be dismissed and the bond provided for in § 742.021 shall be void ..."
It is significant that the foregoing statute provides that if the mother and the reputed father should at any time after its birth intermarry, the child shall be deemed and held legitimate. Obviously, the legislature meant the "reputed father" and the mother in relation to both statutes and did not intend by use of the word "parents" in one to open the question of parentage to later attack by collateral kin. 336 So.2d at 1216-17 (emphasis in original).
The district court reasoned that upon acknowledgment and marriage Charles became a legitimate child of the marriage between William and Marcelle and achieved the same status as a child born in wedlock. Due to the presumption that a child born in wedlock is the blood issue of the partners of such marriage, an individual who seeks to challenge the legitimacy of such a child has a strong, albeit rebuttable, presumption of legitimacy to overcome. The court concluded that although the husband and reputed father has the right to challenge the parentage of a child who has been legitimatized by compliance with the provisions of Section 731.29(1), supra, this right does not extend to the mother and, by the same token, is not accorded to the father's collateral kindred after his death. Because of the absence of standing of the collateral kindred of William to challenge the parentage of Charles, the district court determined that the evidence relied upon by the circuit judge in ruling that Charles is not the blood issue of William was irrelevant. Charles' legitimatization resulting from the acknowledgment and marriage, by definition, rendered him the blood issue of the marriage of William and Marcelle. Consequently, Charles was held to take under the trust instrument which provided for distribution to the blood issue of William.
We agree with the district court that the legislature intended that, upon acknowledgment by the reputed father and his marriage to the natural mother pursuant to the provisions of Section 731.29(1), supra, a child becomes the legitimate child of the marriage between those parties and achieves a status equal to that of a child born in wedlock. Accordingly, such a legitimatized child is necessarily the blood issue of the acknowledging and marrying father. In addition, because compliance by William Barnett with all the provisions of Section 731.29(1), rendered Charles "legitimate for all purposes," factual proof of paternity by William was unnecessary in the declaratory judgment proceedings in issue.
This conclusion follows from a reading of Section 731.29(1), Florida Statutes (1973), the Florida Probate Law, in pari materia with Sections 742.011, 742.021, 742.031, and 742.091, Florida Statutes (1973), the determination of paternity statutes. That part of Section 731.29(1) which renders an illegitimate child the heir "of the *404 person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father" fully contemplates that the one who so acknowledges the child is, in fact, its natural father. However, the enactment does not require submission of proof of paternity by the acknowledging individual and, further, provides that intermarriage of the child's parents shall render the child "legitimate for all purposes." We are persuaded that these provisions reflect the intent of the legislature to stabilize the status of a child born out of wedlock when an individual willingly assumes the responsibilities attendant to fatherhood by formally acknowledging his paternity of the child and, in addition, by marrying the mother of the child which he has recognized as his own. If Section 731.29(1) emphasized factual proof of paternity rather than a simple attestation by which one willingly recognizes his status as a parent, petitioners could more persuasively argue that the statute contemplates their challenge to the paternity of Charles.
To be contrasted are proceedings for determination of paternity pursuant to Sections 742.011, 742.021, and 742.031, Florida Statutes (1973), whereby a woman seeks to have one who is unwilling to accept the burdens of parenthood adjudicated the father of her child so that he may be legally compelled to accept these responsibilities. In such proceedings factual proof of biological paternity is of paramount importance, as is clearly reflected by these statutory provisions. See Sections 742.011, 742.021, and 742.031, Florida Statutes (1973); Bishop v. State ex rel. Garnette, 136 Fla. 268, 186 So. 413 (1939); de Moya v. de Pena, 148 So.2d 735 (Fla. 3d DCA 1963); Belin v. Sanchez, 101 So.2d 64 (Fla. 3d DCA 1958). Where an individual affirmatively seeks to assume the responsibilities of fatherhood, however, provisions for determination of paternity, like Section 731.29(1), do not require proof of paternity by that person. Section 742.091, Florida Statutes (1973), provides that marriage by the "reputed father" to the mother of the illegitimate child shall render the child legitimate for all purposes. Again, factual proof of paternity is not required of the person who willingly seeks to assume the responsibilities of parenthood. As was recognized by the district court in the case sub judice:
Obviously, the legislature meant the "reputed father" and the mother in relation to both statutes [Section 731.29(1) and Section 742.091] and did not intend by use of the word "parents" in one [Section 731.29(1)] to open the question of parentage to later attack by collateral kin. 336 So.2d at 1216-17 (emphasis in original).
By virtue of his formal acknowledgment of paternity with respect to Charles, William certainly achieved the status of a "reputed father" in the sense contemplated by Section 731.29(1). Consequently, the marriage of William to Marcelle made Charles legitimate for all purposes, thereby rendering factual proof of paternity by William irrelevant.
Petitioners rely upon In re McCollum's Estate, supra, in support of their contention that the provision in Section 731.29(1), that intermarriage of the "parents" of an illegitimate child shall render such child "legitimate for all purposes" requires intermarriage of the child's natural parents. Consequently, conclude petitioners, proof of paternity by William is necessary. As was recognized by the district court in the instant case, however, only the first part of Section 731.29(1) was involved in McCollum. There was no marriage between the mother and reputed father of the child, but merely an acknowledgment of paternity by the reputed father. Accordingly, the second part of the enactment, which provides that upon intermarriage of the parents the child shall be deemed legitimate for all purposes, was inapplicable and not considered by the Court. The illegitimate child who sought to inherit from his alleged father's estate in McCollum was therefore required to prove the fact of paternity as well as the acknowledgment. Here, however, there was both intermarriage and an acknowledgment, thus rendering Charles legitimate for all purposes and proof of paternity unnecessary. Petitioners also cite Taylor v. Taylor, supra, wherein the District Court of Appeal, *405 Fourth District, concluded that Section 731.29(1) requires intermarriage by the natural parents of an illegitimate child. We adopt the response to this argument made by the district court below:
The factual situation in Taylor was totally different from that in the case sub judice, it being a divorce case in which the child was conceived before marriage and was born in wedlock. The husband contended (successfully) that he was not the father. In our view, it was unnecessary for the court to construe the aforesaid statute in the manner in which it did in order that the husband be allowed to contest the fatherhood of the child as we will subsequently point out. We disagree with the Fourth District Court's construction of the statute. 336 So.2d at 1217 (emphasis in original).
As was acknowledged by the district court in the case sub judice, the father of a child born in wedlock has the right to challenge the parentage of that child despite the presumption that it is the legitimate issue of his marriage to its mother. Eldridge v. Eldridge, 153 Fla. 873, 16 So.2d 163 (1944). It clearly is not in the best interests of a legitimate child to permit its father to later challenge the fact of paternity. However, this right is accorded the father of a legitimate child in order that he may not be inequitably saddled with the emotional and financial responsibilities of parenthood when he is not, in fact, the parent of the child.
Since our decision in Gammon v. Cobb, 335 So.2d 261 (Fla. 1976), the right to challenge the legitimacy of a child conceived to a married woman was extended to its mother as well. The basis of our decision was the achievement of equal protection of the law for such a child. Previously, "the anomalous situation exist[ed] where the reputed father of an illegitimate child born to his wife [could] attack the child's parentage and be relieved of the obligation to support the child, but at the same time the wife [could] not maintain a suit to compel the putative or natural father to provide support for the child." 335 So.2d at 265. Although the right to challenge a child's legitimacy was extended to the mother in Gammon, the welfare of the child was the controlling policy  the extension of the right meant that the married mother could seek support for the child in a situation in which previously she was not allowed to do so.
Eldridge and Gammon both rest on strong policy reasons which countervail the policy of legitimatizing children. To permit the collateral kindred of William to challenge the parentage of Charles, however, is not supported by any such policy considerations and would seriously undermine the status of every child born out of wedlock who is subsequently legitimatized by acknowledgment and intermarriage pursuant to Section 731.29(1). Petitioners are attempting to prevent distribution of the trust property to respondent which property, according to the terms of the trust instrument, is to be distributed to the surviving blood issue of William Barnett. If successful, these efforts would benefit only petitioners, who are designated as beneficiaries of the trust in the event that William died without surviving blood issue.
Petitioners have forcefully argued that subsequent to his estrangement from Charles, William Barnett did not consider Charles to be his son. Consequently, William purportedly did not intend, by use of the term "blood issue," that Charles receive the trust assets should he survive the death of the former. This Court is cognizant of the well-established principle that the intent of the settlor of a trust is controlling. West Coast Hospital Ass'n v. Florida National Bank, 100 So.2d 807 (Fla. 1958); Watson v. St. Petersburg Bank & Trust Co., 146 So.2d 383 (Fla. 2d DCA 1962). However, unless the trust instrument is ambiguous the intent of the settlor must be ascertained from that which lies within the four corners of the instrument itself, and no extrinsic evidence of the settlor's intent is admissible. See Travis v. Ashton, 156 Fla. 529, 23 So.2d 725 (1945); Pentland v. Pentland, 113 So.2d 872 (Fla. 2d DCA 1959). In the case at bar William Barnett directed that the trust assets should be distributed *406 to his "blood issue." When a technical term is used in a trust instrument it should be accorded its legal definition in determining the intent of the settlor, unless obviously used by him in a different sense. See In re Catlin, 97 Misc. 223, 160 N.Y.S. 1034 (1916); cf. Bradford v. Johnson, 237 N.C. 572, 75 S.E.2d 632 (1953). An intent to use a technical term in other than its legal sense would become manifest when, by a reading of the trust instrument with an application of the legal definition to such term, an ambiguity arises. No ambiguity is created by an application of the legal definition to the term "blood issue," as used in the trust instrument in question. By virtue of William's compliance with the provisions of Section 731.29(1), Florida Statutes (1973), Charles was rendered, by operation of law, the "blood issue" of William. The trust contains no expressed intent to exclude Charles from the definition of this term. Consequently, the district court properly concluded that Charles Barnett, as the blood issue of William Barnett, was entitled to distribution of the trust assets and that the extrinsic evidence relied upon by the circuit court below in ruling that Charles is not the blood issue of William was irrelevant to this determination.
Accordingly, the petition for writ of certiorari is granted. In view of this Court's decision in Gammon v. Cobb, supra, that part of the decision of the District Court of Appeal, First District, concluding that the mother of a child which is legitimatized pursuant to the provisions of Section 731.29(1), Florida Statutes (1973), may not challenge its paternity is hereby expunged. The decision of the district court is affirmed in all other respects.
It is so ordered.
OVERTON, C.J., and ADKINS, BOYD and ENGLAND, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to Art. V, § 3(b)(3), Fla. Const.