710 So.2d 162 (1998)
I.A., Appellant,
v.
H.H., Appellee.
No. 96-05218.
District Court of Appeal of Florida, Second District.
April 22, 1998.
Luis E. Insignares, Goldberg, Goldstein & Buckley, Fort Myers, for Appellant.
Michael P. Reiter, Fort Myers, for Appellee.
NORTHCUTT, Judge.
In this litigation involving the parentage of a young child, the man who has served as the child's father since its birth was ousted as its legal father, in favor of a man whose only connection to the child is biological. We conclude that the biological father had no right to bring the action, and we reverse.

BACKGROUND
The salient facts are uncontested. The child, K.H., was born August 1, 1991. Two months later the child's mother, I.A., married N.H., with whom she had been in a long-term relationship when the child was conceived. At the hearing below, N.H. testified that the couple delayed their marriage solely because of his hesitancy stemming from his own childhood in a broken home. Notwithstanding his concerns about marrying, N.H. enthusiastically undertook the responsibilities of fatherhood. He supported I.A. emotionally and financially throughout her pregnancy. *163 When K.H. was born, N.H. executed the documents necessary to have himself identified as the father on the birth certificate. Thereafter, N.H. gave the child his love, attention, and financial support.
After I.A. and N.H. married, they had another child. By all accounts, the couple and their children lived happily as a typical intact middle-class family, until August 1994, when K.H. was three years old. That month, life changed dramatically for the young family.
Unbeknown to N.H., for a time during the couple's courtship I.A. also had been involved with another man, H.H. The dalliance was secret and brief, and it ended shortly before I.A. learned that she was pregnant. I.A. later testified that, at the time, she was certain that N.H. was the father of the child she carried, and she told H.H. this. H.H. accepted I.A.'s word, and they went their separate ways. But in August 1994, H.H. filed a paternity suit against I.A., alleging that he was K.H.'s father.
In a motion to dismiss H.H.'s initial complaint, and again in an affirmative defense directed to an amended complaint, I.A. alleged that her husband, N.H., was presumed to be K.H.'s legal father and that H.H. had failed to join N.H. as an indispensable party. She also contended that H.H. had failed to allege facts sufficient to show that it would be in the child's best interest to question the presumption of the child's legitimacy, citing Department of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla.1993).
Early in the proceedings the parties stipulated that the blood of H.H., I.A., and the child would be subjected to a Human Leukocyte Antigen (H.L.A.) test to determine the likelihood that H.H. was the child's biological father. The parties agreed that H.H.'s suit would be dismissed with prejudice if the test disclosed a 95 percent or smaller probability of paternity. But several weeks after the blood samples were submitted for analysis, the laboratory reported a 99.7 percent probability that H.H. was K.H.'s biological father.
Armed with the H.L.A. test result, H.H. moved for summary judgment on the question of paternity pursuant to section 742.12(1), Florida Statutes (1993). That statute provides that if an H.L.A. test reveals a 95 percent or greater probability that a person is the biological father of a child, there arises a rebuttable presumption of paternity. The statute further provides that if a party does not rebut the presumption, the court may enter a summary judgment of paternity based on the test result.
I.A. resisted the summary judgment motion. She moved the court to appoint a guardian ad litem for the child, and to interplead N.H. as a party, all pursuant to Privette. Her argument was to no avail. In late October 1995, the court entered a partial summary judgment declaring H.H. to be the child's biological father. The order also provided that the court would schedule a trial on "the issue of whether the parental rights of the plaintiff are to be severed."
Shortly after that order was entered, N.H. moved to intervene in the suit, and he filed a separate "Motion to be Declared the Legal Father of the Minor Child [K.H.]." The latter motion recited that N.H. had been named as the father on the child's birth certificate, married the child's mother, held himself out as the child's father, and supported the child financially and emotionally since birth.
The court held an evidentiary hearing on N.H.'s two motions in late January 1996. In addition to the facts previously described, the evidence showed that H.H. had seen the child only once, during a brief meeting between H.H. and I.A. not long before the suit was filed. Nevertheless, H.H.'s attorney argued that I.A. and N.H. had not proved any legal basis for depriving H.H. of his parental rights. Counsel for I.A. and N.H. contended the facts proved that N.H. was the child's legal father as a matter of law.
In December 1996, the court rendered a "Final Judgment of Paternity" in H.H.'s favor. Although the judgment noted that it arose from a hearing on N.H.'s motions to intervene and to be declared the child's legal father, it did not directly address those motions. The final judgment recognized H.H.'s parental rights, and found no basis for terminating them. It directed the parties and the child to undergo a psychological evaluation, following which the court would convene to *164 determine how H.H.'s rights were to be implemented. I.A. appealed.

DISCUSSION
I.A. contends the circuit court erred by failing to rule on her husband's motion to intervene, to appoint a guardian ad litem to represent the child or to conduct a hearing to determine the child's best interests pursuant to Privette, and by basing its decision in part on its belief that the child's Hispanic appearance should have alerted I.A. to the possibility that H.H. was its father. (Both I.A. and H.H. are Hispanic; N.H. is not.) On the first question, we conclude that the final judgment under review implicitly granted N.H.'s motion to intervene, and denied his motion to be declared K.H.'s legal father.
Beyond that, we find that I.A.'s other contentions are mooted by an issue which has not been raised in the appeal, but which involves an error that is of such a fundamental nature that we are duty bound to correct it: H.H. has been given relief pursuant to a cause of action that does not exist. See Smith v. Pattishall, 127 Fla. 474, 129 Fla. 498, 176 So. 568 (1937).
Seven weeks after rendition of the final judgment in this case, the Fifth District issued an opinion in which it examined the question whether a man claiming to be the biological father of a child born to an intact marriage between its mother and another man can petition to establish his paternity of the child pursuant to the paternity laws contained in chapter 742, Florida Statutes (1995). See G.F.C. v. S.G. and D.G., 686 So.2d 1382 (Fla. 5th DCA 1997). After carefully analyzing the common law, the statutes, and federal and state constitutional considerations, the court concluded that there is no such cause of action. We agree with the G.F.C. court's reasoning and conclusion.
Here, the child was not born to an intact marriage. But we believe that the holding in G.F.C. applies to this case nonetheless. We begin this analysis by noting, as did the Fifth District, that section 742.011 provides that a circuit court may entertain a paternity action when the child's paternity "has not been established by law or otherwise."
Paternity would be established "by law" when there has been an adjudication of paternity or by the filing of affidavits or stipulation acknowledging paternity as provided in section 742.10. Paternity would "otherwise" be established when a child is born to an intact marriage and recognized by the husband and the mother as being their child. In such a case, the husband would be the child's "legal father" to the exclusion of all others. Under any other interpretation, a husband could never be more than a presumptive father absent an adjudication of paternity.
G.F.C., 686 So.2d at 1385.
Chapter 742 also recognizes another circumstance in which a child's paternity is "otherwise" established. Section 742.091 provides that "[i]f the mother of any child born out of wedlock and the reputed father shall at any time after its birth intermarry, the child shall in all respects be deemed and held to be the child of the husband and wife, as though born within wedlock...." The clear import of the statute is that in such circumstances the parties are accorded the same status they would have if the child were born during the marriage. See Knauer v. Barnett, 360 So.2d 399 (Fla.1978).
In Knauer, the supreme court construed similar language in section 731.29(1), Florida Statutes (1973), a provision of the Florida Probate Code addressing the inheritance rights of illegitimate children. Reading that statute in pari materia with section 742.091, the court wrote that "[w]e are persuaded that these provisions reflect the intent of the legislature to stabilize the status of a child born out of wedlock when an individual willingly assumes the responsibilities attendant to fatherhood by formally acknowledging his paternity of the child and, in addition, by marrying the mother of the child which he has recognized as his own." Knauer, 360 So.2d at 403. That salutary purpose is served by statutorily affording such children the same status that children born within wedlock enjoyed at common law. As the G.F.C. court noted, chapter 742 did not abrogate the common law so as to permit a third party claiming to be the biological father of a child born to an intact marriage to assert his *165 paternity of the child. See G.F.C., 686 So.2d at 1385. To the contrary, by enacting section 742.091 the legislature expanded the common law rule to include a child born prior to its mother's marriage to the reputed father.
The undisputed evidence at the hearing below firmly established that N.H. was K.H.'s reputed father when N.H. and I.A. married. Obviously, N.H. thought that he was the child's father, and he conducted himself accordingly. He gave his emotional and financial support to the mother during the pregnancy and to the child after its birth, allowed himself to be identified as the child's father on its birth certificate, and held himself out to be the father at all times. Certainly, the child, who had the benefit of N.H.'s love and support from the moment of birth, believed N.H. to be the father. And, of course, the State was of the view that N.H. was the father, by virtue of its own official records. Cf. Dept. of Health and Rehabilitative Services v. C.M.N., 661 So.2d 22 (Fla. 2d DCA 1994) (man who married woman eight months after she gave birth out of wedlock was not child's reputed father for purposes of section 742.091, where the child's birth certificate was silent as to the father, the mother had never held her husband out as the child's father, and both the husband and the child knew that the husband was not the father).
The only parties with any reason to doubt N.H.'s parentage of the child were I.A. and H.H., owing to their shared knowledge that they had been intimate during the likely period of conception. Yet they, too, conducted themselves as if N.H. were the father. At the hearing below, I.A. testified that she actually believed that to be the case.[1] Whatever doubts H.H. may have had at the time, he did not challenge I.A.'s belief that N.H. was the father. To the contrary, at the hearing he testified that he "told her to go back to [N.H.]." Thus, even those who might have questioned N.H.'s status as the child's reputed father did not do so; far from it, they encouraged the world to accept him as such.
At every stage of the proceedings below, I.A., and later N.H., argued the effect of the circumstances on which we base our decision. But neither of them perceived or argued, either in the circuit court or on appeal, that those circumstances precluded H.H.'s action. Although positions that are not presented to the trial court or argued on appeal generally are waived, it is our duty to notice and correct jurisdictional defects or fundamental errors even when they have not been identified by the parties. See Smith, 176 So. at 575. Such is the case where the trial court has granted relief that is not authorized by law, or pursuant to a cause of action that either does not exist or is not available to the plaintiff. See, e.g., Anders v. Nicholson, 111 Fla. 849, 150 So. 639 (1933); Florida Packing & Ice Co. v. Carney, 49 Fla. 293, 38 So. 602 (1905); Keyes Co. v. Sens, 382 So.2d 1273 (Fla. 3d DCA 1980).
In this case, the pleadings filed by I.A. and N.H. alleged, and the undisputed proof at the hearing confirmed, that N.H. was the child's reputed father. That being so, when I.A. and N.H. married two months after K.H.'s birth, by law K.H. was "in all respects" deemed to be N.H.'s child, "as though born within wedlock." § 742.091, Fla. Stat. (1991). For this reason, we believe that this case is controlled by the holding in G.F.C. H.H. had no cause of action, and the circuit court had no authority to entertain his quest for parental rights to K.H. See § 742.011, Fla. Stat. (1995); G.F.C., 686 So.2d at 1385.
We reverse the final judgment of paternity, and remand with directions to dismiss *166 H.H.'s suit with prejudice. Because our decision extends the precise holding of G.F.C., we certify that this case presents the following question of great public importance:
WHEN THE MOTHER OF A CHILD BORN OUT OF WEDLOCK HAS THEREAFTER MARRIED THE CHILD'S REPUTED FATHER, THEREBY CAUSING THE CHILD TO BE DEEMED THE CHILD OF THE HUSBAND AND WIFE AS THOUGH BORN WITHIN WEDLOCK PURSUANT TO SECTION 742.091, FLORIDA STATUTES (1991), MAY A THIRD PARTY CLAIMING TO BE THE CHILD'S BIOLOGICAL FATHER BRING SUIT TO ESTABLISH HIS PARENTAL RIGHTS AND RESPONSIBILITIES TO THE CHILD?
Reversed and remanded with directions; question certified.
PATTERSON, A.C.J., and WHATLEY, J., concur.
NOTES
[1] We reject the circuit court's finding that I.A. "willfully overlooked all the signs showing the child to be a full-blooded or near full-blooded Latino/Hispanic child". That conclusion, based solely on the court's examination of a walletsized department store photograph of the child taken at age one, rested on fallacious assumptions that were simply unsupported by the evidence. First, the circuit court assumed that a child born to one Hispanic parent and one non-Hispanic parent could not have Hispanic features. Second, the court assumed that I.A. would have shared the court's belief in that regard and, upon observing the infant K.H., would have concluded that N.H. was not the child's father. Third, the court assumed that the photograph of the child at age one accurately depicted the child's appearance in infancy. Those assumptions were wholly unfounded.