336 So.2d 1213 (1976)
Charles BARNETT, Appellant,
v.
William R. BARNETT, Trustee, et al., Appellees.
No. V-134.
District Court of Appeal of Florida, First District.
August 13, 1976.
Rehearing Denied October 4, 1976.
*1214 C. Harris Dittmar, of Bedell, Bedell, Dittmar & Zehmer, Jacksonville, for appellant.
Mahoney, Hadlow, Chambers & Adams and Jack F. Wayman, Jacksonville, for appellee.
McCORD, Judge.
This is an appeal from a final declaratory judgment of the trial court holding that appellant, Charles Barnett, (hereinafter referred to as Charles) "is not the blood issue of William L'Engle Barnett and is not entitled to distribution of any of the income or corpus of the trust estate in question." The suit for declaratory judgment was brought by appellee-trustee, William R. Barnett, seeking a judicial determination of the parties entitled to receive the income and corpus trust property previously held for the benefit of William L'Engle Barnett, deceased (hereinafter referred to as William). Under the terms of the trust documents, the income and corpus are distributable to the surviving blood issue of William, or to collateral kin of William if no blood issue exists. Charles, who claimed to be the son and blood issue of William, was a defendant in the suit below and the collateral kin of William, who claimed that he had no blood issue, were also defendants and are appellees here.
The original trust instrument was executed on June 11, 1931, by Bion H. Barnett, father of William, and it provided that the income be paid to his wife Lina during her lifetime and for the period of ten years following her death to their four children: William, Madeline Barnett Camp, Bion H. Barnett, Jr., and Donald M. Barnett. At the end of the ten year period following Lina's death, the corpus was to be distributed in equal shares to the surviving children or the the surviving "issue (exclusive of adopted children)" of any deceased child or children. Lina died in 1934, and on July 12, 1941, at a time in excess of three years before the trust was to terminate, Bion H. Barnett, the grantor of the trust, Donald M. Barnett, the then acting trustee, and the remaining three children named as beneficiaries in the original trust agreement executed an indenture extending the term of the trust until the death of the survivor of the original four beneficiaries. This indenture further provided that upon the death of such survivor, the corpus of the trust was to be distributed to the surviving "issue of the blood" of the four original beneficiaries.
Thereafter, William and the other Barnetts entered into a new agreement executed in 1959 which provided for income payments to William's wife in the event he predeceased her and for the payment from trust funds of up to $50,000 of William's estate taxes upon his death. The new agreement retained the provision of the 1941 agreement that the corpus be distributed to the surviving "blood issue" of the four original beneficiaries.
Charles' mother died in 1967, and William died in 1968. Following William's death, Charles' counsel notified the trustee that Charles claimed the benefits under the trust as surviving blood issue of William and the other defendants notified the trustee that they claimed the benefits on the ground that William died without blood issue. Because of the conflicting claims, the trustee withheld making payments to anyone and ultimately filed this action in the court below.
The basic issue before the trial court and here is whether or not Charles was the blood issue of William under a construction of § 731.29(1), Fla. Stat. (1973), which provides as follows:
"Every illegitimate child is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father. Such illegitimate child shall inherit from his mother and also, when so recognized, from his father, in the same manner as if the child had been born in lawful wedlock. However, such illegitimate child does not represent his father or mother by inheriting any part *1215 of the estate of the parents' kindred, either lineal or collateral, unless his parents have intermarried, in which event such illegitimate child shall be deemed legitimate for all purposes."
The chancellor below, in applying the foregoing statute to this proceeding, construed it to mean that the parentage of Charles is the factual issue in the proceeding even though William in writing, signed in the presence of a competent witness, acknowledged himself to be the father of Charles and married Charles' mother. We do not so construe it. The chancellor prepared and filed a memorandum opinion which is a very thorough analysis of his view of the evidence from which he finds that Charles is not the blood issue of William. It is our view, however, that the operation of the statute forecloses such issue in this proceeding, the issue having been created by the collateral kin of William.
Charles Barnett was born in Paris, France, on May 28, 1913, to Marcelle Perron, who was then 19 years old according to the official French record of his birth. On June 12, 1913, he was baptized in the Church of the Parish of St. Sulpice, Archbishopry of Paris, and his baptism was noted in the church's Baptismal Register with the space for his father's name left blank. In both the official civil and church records, Charles was originally identified as "Charles Perron."
On August 13, 1918, William L'Engle Barnett and Marcelle appeared before Deputy Mayor Christie of the 17th District of Paris and declared in the presence of witnesses that they "recognize as their son" the child Charles, born to Marcelle on May 28, 1913. An official entry of this act of recognition was made in the birth records of the 17th District of Paris and was signed by William, Marcelle, two witnesses and the Deputy Mayor. Four days later, on August 17, 1918, William and Marcelle appeared again before Deputy Mayor Christie, and he performed their lawful marriage, recording it in the official records. At the time of the marriage, Deputy Mayor Christie delivered to William the "Livret de Famille" the official family booklet required by French law to be retained by the head of each family as the official record of the family members. In that booklet, Deputy Mayor Christie officially recorded the marriage of William and Marcelle on August 17, 1918, and the birth of their child Charles on May 28, 1913, affixing his seal and signature.
On July 1, 1920, William and Marcelle caused Charles' official birth record to be corrected to change his name from Charles Perron to Charles Barnett. The French official corrected the original birth record by striking through the name "Perron" and writing above it the name "Barnett" and by writing on the original birth record the following:
"Recognized the 13 August 1918, at the courthouse of the 17th district of Paris by William Barnett & Marcelle Amelie Anna Perron"
and
"Legitimized by marriage of William Barnett & of Marcelle Amelie Anna Perron, celebrated at the courthouse of the 17th district of Paris, the 17 August 1918."
On September 10, 1921, William and Marcelle caused the Baptismal Register of the Church of the Parish of St. Sulpice to be rectified to show "William Barnett" as the father of Charles and to change the name in the record from "Charles Perron" to "Charles Barnett." The change was made by striking through the name "Perron" and writing above it the name "Barnett" and by noting on the original record that it has been "rectified at the archbishopry on the 10 Sept. 1921." Also on September 10, 1921, William and Marcelle obtained a certificate from the Secretary of the Archbishopry certifying the baptism on June 12, 1913, of Charles, born May 28, 1913, the son of William and Marcelle.
On October 2, 1922, William and Marcelle placed Charles in the College Chaptal in Paris, where he received his formal education at their expense until November 7, 1928. During part of that time, William and Marcelle lived in Paris, and Charles lived with them.
*1216 On June 5, 1926, William was issued an identity card by the Paris police which showed him to be an American citizen with a Paris residence, and listed Marcelle as his spouse and Charles, born 1913 in Paris, as his child. A similar identity card was issued at the same time to Marcelle.
On November 7, 1928, Charles left France, traveling with William and Marcelle, and arrived in the United States on November 13, 1928. The three then drove from New York to William's home in Tangerine, Florida. Upon his arrival in Florida, Charles was registered in the Mt. Dora High School as the son of William L'Engle Barnett of Tangerine from which he graduated in the spring of 1930. In September, 1930, William took Charles to Gainesville and enrolled him in the University of Florida paying his tuition and living expenses. Between November, 1928, and September, 1930, Charles lived with William and Marcelle in the family home in Tangerine.
On August 25, 1933, William and Marcelle swore before a notary public that a petition prepared for filing with the French government was true in stating that Charles had been "acknowledged by the said William L'Engle Barnett as his son." This was for the purpose of obtaining Charles' release of allegiance to the French government preparatory to establishing his United States citizenship. On July 16, 1934, William and Marcelle executed a sworn affidavit for filing with the governments of the United States and France referring to Charles Barnett as "their son" and stating that Charles Barnett had been "acknowledged by the said William L'Engle Barnett as his son." On February 9, 1935, William signed his name in the blank for "father" on Charles' passport application and swore, before a Deputy United States District Court Clerk, in an affidavit of birth to be submitted with Charles' application for passport, that Charles "is my son."
It is thus clear from the foregoing that William acknowledged in writing before witnesses both before and after his marriage to Marcelle that Charles was his son, and he was raised and cared for as his son. This satisfies all of the foregoing statutory requisites for legitimatizing Charles and establishing William as his father. Charles cannot be the legitimate son of William without also being the blood issue of William.
The chancellor below, in construing the statute, ruled that a child was not rendered legitimate for all purposes by the signed acknowledgment of the person who in writing acknowledges himself to be the father of the child and also marries the mother; that because the statute refers to subsequent intermarriage of the parents, such means the child's natural parents, thereby leaving open for adjudication at some future time the question of legitimacy. This construction in our view nullifies the obvious intent of the statute which was to lay at rest the question of legitimacy when the reputed father acknowledges the child before a witness and marries the mother. We do not believe it was the legislative intent to leave this question dangling for future litigation many years later (usually at the death of the father) when the problem of proof, though it could be difficult enough at the time of acknowledgment and marriage, would be far more difficult in later years. In this connection, § 742.091, Fla. Stat. (1973), a part of the bastardy statute, should be considered in pari materia with § 731.29(1), supra. § 742.091 states as follows:
"If the mother of any bastard child and the reputed father shall at any time after its birth intermarry, the child shall in all respects be deemed and held legitimate, and upon the payment of all costs and attorney fees as determined by the court, the cause shall be dismissed and the bond provided for in § 742.021 shall be void ..."
It is significant that the foregoing statute provides that if the mother and the reputed father should at any time after its birth intermarry, the child shall be deemed and held legitimate. Obviously, the legislature *1217 meant the "reputed father" and the mother in relation to both statutes and did not intend by use of the word "parents" in one to open the question of parentage to later attack by collateral kin.
We have considered the opinion of the District Court of Appeal, Fourth District, in Taylor v. Taylor, 279 So.2d 364 (Fla.4th DCA 1973). The majority opinion there attaches the same significance to the word "parents" in the statute as did the chancellor below. The factual situation in Taylor was totally different from that in the case sub judice, it being a divorce case in which the child was conceived before marriage and was born in wedlock. The husband contended (successfully) that he was not the father. In our view, it was unnecessary for the court to construe the aforesaid statute in the manner in which it did in order that the husband be allowed to contest the fatherhood of the child as we will subsequently point out. We disagree with the Fourth District Court's construction of the statute.
Appellees also rely upon In re McCollum's Estate, 88 So.2d 537 (Fla. 1956), in support of their contention that the fact of paternity must be proved. In the Supreme Court's opinion in McCollum, it referred to In Re Horne's Estate, 149 Fla. 710, 7 So.2d 13 (1942), and Wall v. Altobello, 49 So.2d 532 (Fla. 1950), and stated:
"As shown in those cases, the claimant under the statute is required to prove three things: (1) the fact of paternity, and (2) the fact of written acknowledgment of paternity, and (3) the presence of a competent witness, all equally essential to the establishment of a claim thereunder... ."
We have examined McCollum, Horne and Wall and find that in each instance only the first part of the statute (§ 731.29(1), Florida Statutes 1973) was involved and was construed. In each instance there was no marriage between the child's mother and the reputed father. Thus, only the first portion of said statute was applicable. It states as follows:
"Every illegitimate child is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father. Such illegitimate child shall inherit from his mother and also, when so recognized, from his father, in the same manner as if the child had been born in lawful wedlock... ."
The three foregoing cases each dealt with an alleged illegitimate child who sought to inherit from his alleged father's estate. Such child had not been made legitimate by the marriage of its mother to the reputed father and the reputed father's acknowledgment in the presence of a witness. Being an illegitimate child, it was necessary that the child prove its legitimacy as well as the acknowledgment. When, however, as in the case sub judice, the reputed father marries the mother, the second part of the statute comes into play. It states as follows:
"However, such illegitimate child does not represent his father or mother by inheriting any part of the estate of the parents' kindred, either lineal or collateral, unless his parents have intermarried, in which event such illegitimate child shall be deemed legitimate for all purposes." (Emphasis supplied)
It is clear that upon acknowledgment and marriage the child becomes a legitimate child of the marriage and stands on the same footing as a child born in wedlock. If the child is legitimate, he necessarily is the blood issue of the marriage.
Had William not considered Charles to be his natural son, he could have adopted him through an adoption proceeding, but instead he chose to acknowledge him as his son numerous times in writing, before witnesses, and in affidavits. He has now died without having himself raised this issue for adjudication in any legal proceeding.
In discussing the somewhat parallel situation as to the presumption of parentage of a child born in wedlock, the Supreme Court in Eldridge v. Eldridge, 153 Fla. 873, 16 So.2d 163 (1944), stated:
"The appellant husband claims he is not the father of the child. Where a child is *1218 born in wedlock the law extends the right to the reputed father to contest the parentage but the mother has no such right. She being restricted, to question the identity of the child only. Gossett v. Ullendorff, 114 Fla. 159, 154 So. 177. Where the legitimacy of a child born in wedlock is questioned by the husband and reputed father, one of the strongest rebuttable presumptions known to the law is required to be overcome before the child can be bastardized. At common law the presumption was at one time virtually conclusive. Law of Illegitimacy by Hooper, p. 202; Anon v. Anon (1856), 22 Beav. 481, 23 Beav. 273. The rule was relaxed later in England and the latter case was overruled in 1903 in The Poulett Peerage A.D. 395. See also Hargrave v. Hargrave, 9 Beav. 552, 50 English Reprint 458. The rule is well established in this country that the husband may make the attack but in so doing he must overcome the strong presumption of legitimacy by clear and satisfactory testimony. Marriage, Divorce, Separation and Domestic Relations by Schouler (6d) Vol. 1, p. 760, Lay v. Fuller, 178 Ala. 375, 59 So. 609; 7 C.J. 953, 10 C.J.S. Bastards, § 3, page 18, § 15, page 76. The better rule is that the husband is not required to prove his contention beyond all reasonable doubt, yet his proof must be sufficiently strong to clearly remove the presumption of legitimacy. The evidence must more than cast a strong suspicion or grave doubt on the paternity of the child. 7 Am.Jur.Par. 43, p. 655; Powell v. State ex rel. Fowler, 84 Ohio St. 165, 95 N.E. 660, 36 L.R.A.,N.S., 255."
It is our view that compliance by a husband with all of the terms of § 731.29(1), supra, raises the presumption of parenthood of the child in question to the status of a child born in wedlock. The husband of the marriage who attempts to disavow the child has an extremely strong presumption to overcome. As stated above in Eldridge, it is one of the strongest rebuttable presumptions known to the law. The right to challenge the child in a legal proceeding is a right of the reputed father. It does not extend to the mother and, by the same token, would not extend to the father's collateral kin after his death. We have not discussed the evidence upon which the chancellor below relied in his ruling that Charles is not the blood issue of William as it is irrelevant to the ruling here made.
Reversed and remanded.
BOYER, C.J., and RAWLS, J., concur.