823 So.2d 97 (2002)
D.F., Petitioner,
v.
DEPARTMENT OF REVENUE ex rel. L.F., et al., Respondents.
No. SC96288.
Supreme Court of Florida.
June 6, 2002.
Peter N. Meros, St. Petersburg, FL, for Petitioner.
Jon J. Johnson, Assistant Attorney General, Child Support Enforcement, Tampa, FL, for Respondents.
Thomas E. Warner, Solicitor General, and T. Kent Wetherell, II, Deputy Solicitor General, Tallahassee, FL, for Robert A. Butterworth, Attorney General, and the State of Florida, Amicus Curiae.
PER CURIAM.
We have for review the decision in D.F. v. Department of Revenue ex rel. L.F., 736 So.2d 782 (Fla. 2d DCA 1999), which certified conflict with the opinion in DeRico v. Wilson, 714 So.2d 623 (Fla. 5th DCA 1998). We have jurisdiction pursuant to article V, section 3(b)(4) of the Florida Constitution. For the reasons expressed below, we approve the decision in D.F. and disapprove DeRico.
The facts of the case below, as stated by the district court, are as follows:
I. THE PASCO COUNTY DIVORCE PROCEEDING

*98 D.F. and L.F. were married in Virginia in 1986. About three months later, L.F. gave birth to a child in Virginia. The couple then moved to Florida. Shortly after the child's second birthday, D.F. filed a petition for dissolution of marriage in Pasco County. D.F. alleged that the child was a marital child, that the parties should have shared parental responsibility for the child, and that the maternal grandparents should have "primary residential custody."
The couple signed a marital settlement agreement that provided the couple would have shared parental responsibility of the child, but that L.F. would have primary residential custody. The agreement provided that D.F. would pay child support in the amount of $40 per week to the maternal grandparents, "as the minor child is currently residing in their household."
The circuit court entered a final judgment on September 28, 1988, incorporating the settlement agreement, but also providing that the maternal grandparents would provide "primary physical residence" for the child. Apparently, the trial court intended to give the mother "primary residential custody" of the child, from the standpoint of parental decision-making, with the understanding that the child would actually live in the grandparents' home. The grandparents were not parties to this divorce proceeding. In the final judgment, child support was payable directly to the grandparents.
In March 1991, L.F., through the Department of Health and Rehabilitative Services, filed a motion for contempt and for an income deduction order. As a result of a stipulation signed by D.F., the court entered an income deduction order. This order redirected the payment of D.F.'s child support obligation to the clerk of circuit court. The order did not specify whether L.F. or the maternal grandparents were to receive these payments from the circuit court. The maternal grandparents were not parties to this proceeding, and D.F. did not object to their absence.
On July 21, 1997, the Department of Revenue (the "Department"), on behalf of L.F., filed a petition in the Pasco County dissolution proceeding to increase D.F.'s child support obligation. In conjunction with this filing, L.F. signed an affidavit stating that she was the custodian of the child. From the Department's petition, it is unclear whether L.F. has received welfare benefits for the child or whether she is otherwise entitled to receive assistance from the Department in this case. D.F. filed a response to this petition alleging that he was not the biological father of the child and claiming that venue was proper in Pinellas County, where he now resides. His response further claimed that both a putative father and the grandparents were indispensable parties to the action to modify child support. Thus, D.F. first raised the issue of biological fatherhood in this dissolution proceeding nine years after the entry of the final judgment, at a time when the child was eleven years old.
The Pasco County dissolution action was stayed while an action challenging paternity, which is described later in this opinion, was pending in Pinellas County. After that action was dismissed, the Pasco County Circuit Court entered an order increasing D.F.'s child support obligation to $421 per month....
. . . .
II. THE PINELLAS COUNTY ACTION TO TERMINATE D.F.'S STATUS AS LEGAL FATHER

*99 On July 25, 1997, fours days after the Department of Revenue filed its petition in the Pasco County dissolution proceeding, D.F. filed a "Supplemental Petition to Terminate Support or to Set Aside Judgment" in Pinellas County. The petition attached and incorporated the final judgment of dissolution. The action is not styled as a paternity action, and actually seeks to reverse a prior determination of paternity. The petition affirmatively alleges that D.F. never had sexual relations with L.F. prior to January 1986, and could not possibly be the child's biological father. Accordingly, his own pleading establishes that D.F. knew about the issue of biology prior to the marriage in March 1986 and prior to the divorce in 1988.
Apparently, the Department is not required to represent litigants such as L.F. in such ancillary proceedings, even if that litigation is the result of the Department's filing. Thus, a clerk's default was entered in this action against L.F. With no one representing the child and a default in place against L.F., the trial court entered an order requiring the mother and child to undergo DNA testing. The trial court apparently concluded this was permissible in light of Daniel v. Daniel, 695 So.2d 1253 (Fla. 1997). L.F. complied with this order, and the results supported D.F.'s position on the issue of biological fatherhood.
Prior to the conclusion of the Pinellas County case, during a hearing on March 10, 1998, at which no one was present to represent the mother or child, the trial judge, Marion L. Fleming, realized that the case presented some serious legal issues and determined that another action was pending in Pasco County. She obtained the Pasco County court file and reviewed the divorce pleadings. Thereafter, Judge Fleming concluded she had erroneously entered the order requiring DNA testing. She entered an order denying and dismissing D.F.'s petition, finding that D.F. had contracted to support the child in 1988 and was estopped in 1998 by the 1988 judgment to contest paternity. She ruled that D.F. had pleaded no issue of extrinsic fraud or any other basis that might allow him to seek relief from the 1988 judgment of dissolution in 1997. Accordingly, she held that the issue of paternity could not be challenged based on res judicata. Following a rehearing in which the trial court confirmed these conclusions, D.F. appealed.
D.F., 736 So.2d at 783-86 (footnotes omitted). On appeal, the district court affirmed, holding that D.F. was barred by res judicata due to the prior final judgment of dissolution of marriage.
In DeRico, three children were born during the couple's marriage. The couple separated shortly after the third child was born. A final judgment of dissolution of marriage was entered on May 9, 1994. The dissolution judgment ordered Mr. DeRico to pay $943 per month in child support. In January of 1996, a DNA test was performed as to the youngest child by agreement of the parties. The test revealed that the husband was not the biological father of the child. Another test revealed the same result for the middle child. Based on these results, Mr. DeRico moved the trial court to terminate his child support obligation for the two children. The trial court denied relief. However, shortly after the trial court's ruling, this Court released its opinion in Daniel v. Daniel, 695 So.2d 1253, 1254 (Fla.1997), wherein we held that a former husband has no duty to support a child he neither biologically fathered, adopted, nor contracted to care for. On appeal in DeRico, the Fifth District Court of Appeal applied *100 Daniel and held that Mr. DeRico was not required to support the children.
The issue presented in this case concerns the ability of a former husband to challenge paternity more than one year after a final judgment of dissolution of marriage for the sole purpose of terminating a child support obligation. The issue requires us to balance the need for finality of judgments with our previous holding in Daniel that a former husband who raises the issue of paternity during a dissolution of marriage proceeding has no legal duty to provide support for a child he neither biologically fathered, adopted, nor contracted to care for. We hold that a final judgment of dissolution of marriage which establishes a child support obligation for a former husband is a final determination of paternity. Any subsequent challenge of paternity must be brought under the provisions of Florida Rule of Civil Procedure 1.540.[1] Rule 1.540 states in relevant part:
(b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud; etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, decree, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial or rehearing; (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) that the judgment or decree is void; or (5) that the judgment or decree has been satisfied, released, or discharged, or a prior judgment or decree upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment or decree should have prospective application. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than 1 year after the judgment, decree, order, or proceeding was entered or taken. A motion under this subdivision does not affect the finality of a judgment or decree or suspend its operation. This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, decree, order, or proceeding or to set aside a judgment or decree for fraud upon the court.
(Emphasis supplied.) In the present case, the trial court denied D.F.'s petition to terminate support, finding that D.F. had pleaded no issue of extrinsic fraud or any other basis that might allow him to seek relief from the 1988 judgment of dissolution in 1997. This conclusion is consistent with rule 1.540 and therefore we find no error.
Accordingly, we approve the decision below and disapprove DeRico.
It is so ordered.
HARDING, ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion, in which ANSTEAD, J., concurs.
WELLS, C.J., concurs in result only with an opinion.
LEWIS, J., concurs in result only with an opinion, in which SHAW, J., concurs.
*101 PARIENTE, J., concurring.
Although I fully concur in the majority opinion, I write separately to urge the Legislature to address the difficult issues raised in cases such as this one. Cases involving the rights and responsibilities of biological and non-biological parents are no doubt fraught with difficult social issues that translate into complicated legal issues. The legal problems that arise are not limited to the area of child support, but also may arise in the area of probate, wrongful death, adoption, and actions to terminate parental rights. The continuing struggles the courts have had in adjusting outmoded common law notions to modern-day realities and the need for statutory reform have been comprehensively and thoughtfully analyzed in an article written by Second District Court of Appeal's Judge Altenbernd. See generally Chris W. Altenbernd, Quasi-Marital Children: The Common Law's Failure in Privette and Daniel Calls for Statutory Reform, 26 Fla. St. U.L.Rev. 219 (1999).
The common law rules, as Judge Altenbernd notes, developed at a time of "an agrarian society, in which the family unit was also the most common business entity" and where "children were useful workers and an asset essentially belonging to the marital father." Id. at 232. For example, the presumption of legitimacy, which presumes that a child of a marriage is a marital child, was aided at common law "by Lord Mansfield's Rule, which prohibited either a husband or a wife from testifying that a child born during the marriage was not the marital father's child." Id. at 236. Judge Altenbernd concludes that the availability and accuracy of genetic testing has rendered the common law inadequate to resolve the problems that can arise when a child is born to a woman who is married, but the woman's husband is not the biological father. See id. at 237.
Judge Altenbernd explains that at common law there were only two categories of childreneither "legitimate" or "spurious or bastards." Id. at 231. It was not until the mid 1970s that blood tests could exclude the possibility of paternity and identify the biological father. See id. at 233. "Improvements in genetic testing were the straw that broke the back of the common law's two-category system for classifying children." Id. at 233. As Judge Altenbernd explains:
This conflict arose because the natural law theories at and before Blackstone's time viewed both procreation and marriage as "natural."
Common law judges in the Blackstone era almost certainly wanted to provide families for quasi-marital children because they saw families as desirable for such children and for the kingdom as a whole. They were confronted, however, with long-standing social, religious, and legal traditions granting fathers property rights to children based, at least rhetorically, on biology. This conflict between policiesthose favoring families for children and those favoring the "natural" or property rights of menwas not resolved during the early common law era. Instead, it was avoided by a rigorous application of the presumption of legitimacy and by the passage of bastardy statutes. With the advent of admissible genetic testing, however, lawmakers can no longer avoid these two competing policies. Courts and legislatures must now directly confront the unresolved tension between biology and family in the field of paternal rights and responsibilities.
. . . .
After genetic testing developed, any interested party could overcome the presumption of legitimacy. Suddenly, legitimacy yielded to genetics and thus *102 biology. One suspects that neither Blackstone nor Pufendorf would "naturally" have given substantive or procedural due process rights to a father who was no more than a momentary participant in a casual act of sexual intercourse. Nevertheless, without actually intending to select biological fathers over marital fathers to serve either as functional or support fathers for quasimarital children, the common law was logically postured to give rights and impose responsibilities upon biological fathers.
Id. at 233-34, 237 (footnotes omitted).
Judge Altenbernd notes that the inadequacy of the common law to deal with emerging issues regarding the legal relationships of fathers and children is exacerbated by the shortcomings of existing legal terminology that still has common law roots:
Existing legal terms are often too vague and ambiguous to sufficiently describe the legal complexities of children born to married women when the biological father is not the woman's lawful husband at the time of the child's birth. The current vocabulary uses old terms, such as "natural father" and "legitimacy," which are either legally undefined or have inconsistent definitions in current law. New terms, such as "legal father," have no established definition in either case law or statutes. "Father" is ambiguous because the term may include several different men or functions. A child whose biological mother had an affair, divorced, remarried, and then separated, for example, could have a biological father, a marital father, and an adoptive stepfather, and still fail to have a man to provide emotional support as a functional father or economic support as a support father. Because marital children, especially infants, have only a presumptive legal father under the common law, there is an inherent ambiguity in the term "father." ...
... [O]ur lexicon is cluttered with terms like "bastard," "illegitimate," and even "out-of-wedlock," which have strong religious and moral overtones that tend, at least subconsciously, to interfere with objective, rational analysis.
Id. at 222-24 (emphasis supplied). Based upon these shortcomings in the common law, Judge Altenbernd recommends that
[n]ew statutory rules for determining paternity and parental rights and responsibilities for quasi-marital children must supplant the common law. Both the courts and the Florida Legislature must address the conflict between two opposing ideologies: one that gives deference to biology and the other, deference to the family unit. As a general rule, this conflict must be resolved in the best interests of the child.

Id. at 221-22 (emphasis supplied).
With the shift to an urban society, the increase in the number of divorces, and the advent of genetic testing, both the courts and the Legislature must examine the viability of common law doctrines. See id. at 231. Joining Judge Altenbernd in urging that the social complexities of this issue requires legislative study, Judge Klein observed in Lefler v. Lefler, 722 So.2d 941, 944 (Fla. 4th DCA 1998) (Klein, J., concurring specially):
California has adopted legislation which allows determinations of paternity based on scientific testing only during the first two years of the child's life. Thereafter, there is a conclusive statutory presumption that the child is a child of the marriage. California Code, § 7540 and [§ ]7541. That conclusive presumption has been held constitutional. Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 *103 (1989). In Michael H., the biological father was seeking to be declared the father of a child conceived and born while the mother was married, over the objection of the marital father. It is apparent from the Supreme Court's opinion in Michael H. that it found these social issues difficult and that they were appropriately addressed by the legislature. 491 U.S. at 131, 109 S.Ct. 2333, 105 L.Ed.2d 91.
I share both Judge Altenbernd and Judge Klein's concerns about the inadequacies of the common law to resolve these difficult issues, and similarly suggest that the Legislature study this complex subject.
Finally, in our judicial decision-making we continually strive to act in the best interests of the child. Although we can aspire to achieve this goal, the truth remains that we can neither mandate nor legislate that a person be part of the child's life and provide the child with emotional support, whether that person be a biological father, a marital father, or an adoptive stepfather.
ANSTEAD, J., concurs.
WELLS, C.J., concurs in result with an opinion.
LEWIS, J., concurs in result with an opinion, joined by SHAW, J.
WELLS, C.J., concurring in result only.
I concur with the result in this case.
However, as a matter of policy, I would accept the approach set forth in Judge Klein's concurring opinion in Lefler v. Lefler, 722 So.2d 941 (Fla. 4th DCA 1998).
LEWIS, J., concurring in result only.
Although I would agree with the majority's result as to D.F., I would not disapprove DeRico. It is true that both former husbands contracted to support children which they did not biologically father. However, Mr. DeRico did so without knowing that the children were not his, whereas D.F. agreed to support a child he knew was notand could not behis, and did so for nearly a decade.
Additionally, I disagree with the majority's reasoning that this case "requires us to balance the need for finality of judgments with our previous holding in Daniel that a former husband who raises the issue of paternity during a dissolution of marriage proceeding has no legal duty to provide support for a child he neither biologically fathered, adopted, nor contracted to care for." Majority op. at 100. I believe the majority's focus places form over substance. The real issue, in my view, is whether this case "justif[ies] a deviation" or "present[s] an exception" to the rule reiterated in Daniel that "a person has no legal duty to provide support for a minor child who is neither his natural nor his adopted child and for whose care and support he has not contracted." Daniel v. Daniel, 695 So.2d 1253, 1254 (Fla.1997). It is my opinion that this case does warrant a different result than that reached in Daniel because here, unlike in Daniel, the former husband did contract to support the child and fulfilled that obligation for almost ten years. For these reasons, I concur in result only.
SHAW, J., concurs.
NOTES
[1] Florida Family Law Rule of Procedure 12.540, entitled "Relief From Judgment, Decrees, or Orders," provides that "Florida Rule of Civil Procedure 1.540 shall govern general provisions concerning relief from judgment, decrees, or orders, except that there shall be no time limit for motions based on fraudulent financial affidavits in marital or paternity cases."