WALLACE, Judge.
 

 Catherine E. Doe, a/k/a Catherine D. Roe (Catherine), appeals the circuit court’s summary judgment in favor of Chester P. Doe, III, Roger E. Doe, and XYZ Bank of Florida, N.A., as Co-Trustees of the Chester P. Doe, Jr., Marital Trust and the Eleanor Warren Doe Revocable Trust (collectively, the Trustees).
 
 [1]
 
 The trusts administered by the Trustees include class gifts to the grandchildren of the settlors, Chester P. Doe, Jr. (Chester Jr.) and Eleanor Warren Doe (Eleanor). However, the class gifts are limited to “only children and descendants by blood.” Chester P. Doe III (Chester III) is one of the settlors’ sons. When Catherine was born, Chester III was married to her mother. On Catherine’s birth certificate, Chester III is listed as her father. Nevertheless, because DNA testing performed after Catherine was an adult had shown that Chester III was not Catherine’s biological father, the circuit court ruled that she was “not a descendant by blood” of the settlors and thus had no beneficial interest under the trusts. Because we conclude that Catherine was not excluded as a beneficiary of the trusts’ class gifts by the limitation to
 
 *894
 
 “only children and descendants by blood,” we reverse.
 

 I. THE FACTS
 

 A. The Trusts
 

 On June 28, 1988, Chester Jr. and Eleanor, his wife, executed mutual revocable trust agreements. The current trustees of the trusts are Chester III and Roger E. Doe (the settlors’ sons) and XYZ Bank.
 

 The trusts, as subsequently amended, each contained a provision (Article IV) making cash gifts to various persons upon the death of the settlor. The beneficiaries of the cash gifts payable under Article IV were identified by name. Each of the settlors’ four grandchildren, including Catherine, was to receive $50,000.
 

 Chester Jr. died in 1995. The next year, Eleanor executed a fourth amendment to her trust amending Article IV as it related to Catherine. Instead of giving the $50,000 cash gift directly to Catherine, the amended Article IV gave the cash to Chester III with precatory language requesting that “he use this distribution, in his sole discretion, for the benefit of his child, [Catherine].” In the event Chester III predeceased Eleanor, the amended Article IV gave the cash directly to Catherine.
 

 After the death of Chester Jr. in 1995, the Trustees distributed the cash gifts payable under Article IV of his trust to the named beneficiaries, including Catherine. Additional assets from Chester Jr.’s trusts were placed in a marital trust. Upon Eleanor’s death, Chester Jr.’s marital trust is to be divided into subtrusts as follows: “[0]ne (1) share with respect to each then living grandchild of the Settlor and one (1) share with respect to the then living descendants, collectively, of each then deceased grandchild of the Settlor.”
 

 Eleanor died in 2005. Upon her death, a portion of her trust is to be used to create subtrusts for her grandchildren. In addition, Eleanor’s grandchildren, or then* descendants, are remainder beneficiaries of subtrusts created by Eleanor’s trust for her two sons, Chester III and Roger.
 

 Each of the settlors’ trusts contains an identical provision that we are called upon to interpret in this case. This provision, designated as Article XVIII, states:
 

 For all purposes, hereunder, in determining whether any person is a child or descendant, only children and descendants by blood shall be included. The term “grandchild!,]” as used herein[,] includes all grandchildren of the Settlor and is not limited to grandchildren by the one son whose death causes a trust to terminate.
 

 The critical language here is the limitation of beneficiaries of the class gifts made in both trusts to “only children and descendants by blood.” In other words, Article XVIII restricts the class gifts in the trusts to persons whose relationship to the set-tlors is one of lineal consanguinity.
 

 B. Catherine’s Family History and the DNA Testing
 

 In July 1966, Chester III married Catherine’s mother. Catherine was born approximately six and one-half months later. Her birth certificate lists Chester III as her father. Chester III and Catherine’s mother were divorced in 1971. Chester III and his wife executed a marital settlement agreement that provided, in pertinent part: “There has been one child born of this marriage, to wit: [CATHERINE DOE], age 4 years....” The agreement, which included typical provisions for the payment of child support by Chester III and visitation with his daughter, was approved and incorporated in the final judgment of dissolution of marriage that was subsequently entered. It does not appear
 
 *895
 
 from our record that this final judgment has ever been vacated or modified.
 

 In 1999, when Catherine was thirty-two years old, Chester III submitted samples from Catherine and himself to two separate laboratories for DNA testing.
 
 [2]
 
 The test results from each of the two laboratories conclusively excluded Chester III as Catherine’s biological father. There is no evidence in the record that anyone ever informed Eleanor about the results of the DNA testing. In any event, after the testing was completed, Eleanor did not make any amendments to her trust indicative of an intention to exclude Catherine as a beneficiary. Chester Jr. had died in 1995, before the DNA testing occurred.
 

 C. The Trustees’ Action
 

 Eleanor died in 2005, six years after Chester III received the test results concluding that he was not Catherine’s biological father. In 2006, the Trustees filed an action against Catherine and the settlors’ three other grandchildren under section 737.201, Florida Statutes (2005), seeking an order determining whether Catherine was a beneficiary of the Chester P. Doe, Jr., Marital Trust and the Eleanor Warren Doe Revocable Trust. Relying on the 1999 DNA test results and Article XVIII of the trusts, the Trustees alleged that Catherine “is not a descendant by blood of [Chester P. Doe, Jr.] or [Eleanor Warren Doe], and is, therefore, not a beneficiary of either the Marital Trust or the [Eleanor Warren] Trust with respect to the class gifts to ‘grandchildren’ of the settlors of those trusts, respectively.” Catherine filed an answer to the Trustees’ complaint and raised various affirmative defenses. Defaults were entered against the settlors’ three other grandchildren, and they did not participate in the litigation.
 

 After the case was at issue, the Trustees and Catherine filed cross-motions for summary judgment. Catherine successfully raised chain-of-custody issues concerning the 1999 test results, and the circuit court initially denied both summary judgment motions. Afterward, the Trustees moved for an order directing Catherine to submit to DNA testing under Florida Rule of Civil Procedure 1.360(a). The circuit court granted this motion over Catherine’s objection and ordered her to submit a buccal swab sample for testing.
 
 [3]
 
 Like the 1999 DNA tests, the court-ordered DNA testing conclusively excluded Chester III as Catherine’s biological father.
 

 D. The Circuit Court’s Ruling
 

 Upon receipt of the results of the court-ordered DNA testing, the parties renewed their motions for summary judgment. The circuit court granted the Trustees’ motion, ruling as follows:
 

 [T]he provision in Article XVIII of both [of the trusts], reading, “[f]or all pur
 
 *896
 
 poses hereunder, in determining whether any person is a child or descendant, only children and descendants by blood shall be included,” is unambiguous and means that only descendants of the set-tlors by lineal consanguinity are beneficiaries under the terms of the trust; and the Court further finds no genuine issue as to the material fact that [Catherine] is not the biological child of [Chester III], the son of [Chester Jr.] and [Eleanor], that she is therefore not a descendant by blood of [Chester Jr.] and [Eleanor], and therefore has no beneficial interest in either of the trusts referred to above....
 

 Catherine filed a motion for rehearing, and the circuit court denied the motion. This appeal followed.
 

 II. THE STANDARD OF REVIEW
 

 “Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law.”
 
 Volusia County v. Aberdeen at Ormond Beach, L.P.,
 
 760 So.2d 126, 130 (Fla.2000). Here, the only issue before the circuit court was whether — on the undisputed facts — Article XVIII of the trusts excluded Catherine as a beneficiary of the trusts’ class gifts. The parties filed cross-motions for summary judgment on this single issue. The circuit court’s ruling on the proper interpretation of Article XVIII of the trusts is a question of law subject to de novo review.
 
 See Fleck-Rubin v. Fleck,
 
 933 So.2d 38, 39 (Fla. 2d DCA 2006);
 
 Roberts v. Sarros,
 
 920 So.2d 193, 194-95 (Fla. 2d DCA 2006);
 
 Brown v. Miller,
 
 2 So.3d 321, 323-24 (Fla. 5th DCA 2008).
 

 III. DISCUSSION
 

 A. Introduction: Catherine’s Legitimacy
 

 Catherine was born while Chester III was married to her mother. In addition, Chester III acknowledged his paternity of Catherine and agreed to pay support for her in a marital settlement agreement. The final judgment dissolving the marriage of Chester III and Catherine’s mother approved and incorporated by reference the marital settlement agreement. Under these circumstances, Catherine is indisputably the legitimate child of Chester III.
 
 See D.F. v. Dep’t of Revenue ex rel. L.F.,
 
 823 So.2d 97, 100 (Fla.2002) (“[A] final judgment of dissolution of marriage which establishes a child support obligation for a former husband is a final determination of paternity.”);
 
 A.S. v. S.F.,
 
 4 So.3d 774, 775 (Fla. 5th DCA 2009) (recognizing the general rule “that when a child is born into an intact marriage, as recognized by the husband and wife, the husband is deemed to be the legal father”);
 
 Glover v. Miller,
 
 947 So.2d 1254, 1257 (Fla. 4th DCA 2007) (holding that where there is an existing adjudication of paternity, that adjudication must be given effect for the purposes of intestate succession, even though scientific testing showed that someone other than the man adjudicated to be the decedent’s father was in fact the decedent’s biological father).
 

 B. The Trustees’ Argument
 

 The Trustees concede — as they must— that Catherine is the legitimate child of Chester III. In their argument, the Trustees focus on the absence of a blood tie between Catherine and the settlors. The Trustees argue:
 

 The key point in this case is that it does not involve the legal rights between [Catherine] and [Chester III] arising out of the parental relationship between them. It involves the relationship between the
 
 parents
 
 of [Chester III], the trust settlors, and [Catherine]. The trusts require that the relationship be
 
 *897
 
 tween the trust settlors and [Catherine] be a blood relationship, or in technical terms, a relationship of lineal consanguinity. The grantors were free to exclude any “descendant,” whether legitimate, illegitimate, adopted, or otherwise related by law or by blood.
 

 The Trustees view the limitation of the class gifts to “only children and descendants by blood” as reflective of the set-tlors’ desire to keep “family money” within the family as determined by lineal consanguinity. The Trustees acknowledge that this approach to determining the beneficiaries of the class gifts may not seem enlightened. However, they see this case as involving the settlors’ constitutional right to dispose of their property as they see fit.
 
 See Shriners Hosps. for Crippled Children v. Zrillic,
 
 563 So.2d 64, 67 (Fla.1990) (“[T]he right to devise property is a property right protected by the Florida Constitution.”).
 

 We disagree with the Trustees’ analysis for two reasons. First, the pertinent Florida case law supports the conclusion that Catherine is in fact the “blood issue” of Chester III. Thus Catherine qualifies as a “descendant by blood” of the settlors. Second, the Trustees’ misunderstand Article XVIII’s limitation of the trusts’ class gifts to “only children and descendants by blood.” Language of this sort requiring a blood relationship has historically been used to exclude adoptees from class gifts. Insofar as our research discloses, a limitation to blood descendants has never been applied based on genetic test results to exclude from a class gift a person born into wedlock who would otherwise qualify as a beneficiary of the class gift. Because Catherine is a child of Chester III born into wedlock, Article XVIII’s limitation of the trusts’ class gifts to blood descendants does not exclude Catherine as a beneficiary — regardless of the facts of her genetic parentage. We will discuss each of these reasons separately below.
 

 C. The Pertinent Case Law
 

 An issue similar to the issue in this case was closely examined by the First District in
 
 Barnett v. Barnett,
 
 336 So.2d 1213 (Fla. 1st DCA 1976), and by the Florida Supreme Court in its review of
 
 Barnett
 
 in
 
 Knauer v. Barnett,
 
 360 So.2d 399 (Fla. 1978). Charles Barnett was born in Paris, France, in 1913.
 
 Barnett,
 
 336 So.2d at 1215. Barnett’s birth record identified Marcelle Perron as his mother, but the space for the father’s name was left blank.
 
 Id.
 
 Five years after Charles was born, William Barnett and Marcelle Perron recorded an official declaration in the birth records recognizing Charles as their son.
 
 Id.
 
 A few days after this declaration was recorded, William and Marcelle were married.
 
 [4]
 

 Id.
 
 Charles’ last name was changed in the official records and in the baptismal registry to “Barnett.”
 
 Id.
 
 The family moved to the United States in 1928, and settled in Florida, where Charles graduated from high school in 1930.
 
 Id.
 
 at 1216. The evidence also revealed that the relationship between Charles and his parents deteriorated when Charles married a woman of whom his parents did not approve.
 
 Knauer,
 
 360 So.2d at 402-03. Charles became estranged from his parents, and William began to make public statements indicating that Charles was not his biological son.
 
 Id.
 

 After William’s death, the trustees of a trust established by him sought a declaratory judgment to determine the beneficiaries of the trust.
 
 Id.
 
 at 401. The issue
 
 *898
 
 was whether Charles Barnett was excluded as a beneficiary because the terms of the trust provided that the income and corpus of the trust were distributable to the surviving “blood issue” of William Barnett.
 
 Id.
 
 The supreme court described the issue as follows:
 

 The issue before the lower courts and here is whether Charles is the blood issue of William under a construction of Section 731.29(1), Florida Statutes (1973), which provides:
 

 Every illegitimate child is an heir of his mother, and also of the person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father. Such illegitimate child shall inherit from his mother and also, when so recognized, from his father, in the same manner as if the child had been born in lawful wedlock. However, such illegitimate child does not represent his father or mother by inheriting any part of the estate of the parents’ kindred, either lineal or collateral, unless his parents have intermarried,
 
 in which event such illegitimate child shall be deemed legitimate for all purposes.
 

 Id.
 
 (emphasis added). The trial court found that Charles was not the blood issue of William and that this fact precluded him from receiving any benefits from the trust.
 
 Barnett,
 
 336 So.2d at 1214. On appeal, the First District held that the facts of the case compelled the opposite conclusion:
 

 It is thus clear from the foregoing that William acknowledged in writing before witnesses both before and after his marriage to Marcelle that Charles was his son, and he was raised and cared for as his son. This satisfies all of the foregoing statutory requisites for legitimatizing Charles and establishing William as his father.
 
 Charles cannot be the legitimate son of William without also being the blood issue of William.
 

 Id.
 
 at 1216 (emphasis added). On review by certiorari, the supreme court agreed with the First District:
 

 We agree with the district court that the legislature intended that, upon acknowledgment by the reputed father and his marriage to the natural mother pursuant to the provisions of Section 731.29(1), supra, a child becomes the legitimate child of the marriage between those parties and achieves a status equal to that of a child born in wedlock. Accordingly,
 
 such a legitimatized child is necessarily the blood issue of the acknowledging and marrying father. In addition, because compliance by William Barnett with all the provisions of Section 731.29(1), rendered, Charles “legitimate for all purposes,
 
 ”
 
 factual proof of paternity by William was unnecessary in the declaratory judgment proceedings in issue.
 

 Knauer,
 
 360 So.2d at 403 (emphasis added).
 

 The Trustees argue that
 
 Knauer
 
 is distinguishable because that case involved a trust created by the legal father of a child born out of wedlock but later legitimized. Mr. Barnett’s trust provided for distribution to his own “blood issue” at his death. In this case, the issue is whether a child born during wedlock is related by blood to Chester Ill’s
 
 parents.
 
 The Trustees’ attempt at distinguishing
 
 Knauer
 
 is unpersuasive. The basis of the Trustees’ argument is that Catherine is not the “blood issue” of the settlors
 
 because
 
 she is not the biological daughter of Chester III. Thus, as in
 
 Knauer,
 
 the outcome of this case is determined by the child’s relationship to her legal father. The fact that the settlor in
 
 Knauer
 
 was the legal father and the settlors in the instant case are the parents of the legal father is immaterial.
 

 
 *899
 
 D. The Meaning of the Limitation to “Descendants by Blood”
 

 The Trustees’ argument overlooks the meaning of the term “descendants by blood” and similar expressions as they have been used historically in wills and trusts in connection with the limitation of class gifts to persons related to the testator, the settlor, or some other designated person. Before the advent of modern genetic testing in the last twenty to thirty years, a challenge such as the one the Trustees have brought against Catherine — challenging the paternity of a child born in wedlock — would have been all but unthinkable. The legitimacy of a child born in wedlock is one of the strongest rebuttable presumptions known to the law.
 
 See Eldridge v. Eldridge,
 
 153 Fla. 873, 16 So.2d 163, 163-64 (1944). In addition to facing a very high level of proof, the challenger would have found it difficult — if not impossible — to assemble the evidence necessary to prove such a claim.
 
 See
 
 Chris W. Altenbernd,
 
 Quasi-Marital Children: The Common Laiv’s Failure in Privette and, Daniel Calls for Statutory Reform,
 
 26 Fla. St. U. L. Rev. 219, 236 (1999). Only with the relatively recent development of genetic testing has the proof necessary to overcome the presumption of legitimacy become generally available.
 
 Id.
 
 at 237; Mary R. Anderlik,
 
 Disestablishment Suits: What Hath Science Wrought?,
 
 4 J. Center for Fams., Child. & Cts. 3, 3-4 (2003).
 

 Of course, the use of terms such as “descendants by blood” and similar expressions to limit class gifts began long before genetic testing became available. Such expressions are terms of art that have been traditionally used — sometimes successfully and sometimes unsuccessfully — to limit class gifts to persons related to the testator, settlor, or other designated person by a blood relationship and thus to exclude adopted persons.
 
 See, e.g., Papin v. Pa-pin,
 
 445 S.W.2d 350, 352-53 (Mo.1969) (holding that a class gift in a trust to “heirs at law by blood related to the grant- or” excluded adopted persons);
 
 Fifth Third Bank v. Crosley,
 
 79 Ohio Misc.2d 10, 669 N.E.2d 904, 909 (1996) (holding that a trust provision limiting a class gift to the “lawful issue of the blood of the Trustor” excluded adoptees);
 
 Trust Agreement of Cyrus D. Jones Dated June 2U, 1926,
 
 414 Pa. Super. 361, 607 A.2d 265, 270 (1992) (holding that a trust agreement limiting a class gift to the “lawful issue of the blood” did not exclude adopted descendants). In the modern era, the trend has been away from a focus on blood relationships and toward treating the adoptee as a full member of his or her adoptive family.
 
 See
 
 Jan Ellen Rein,
 
 Relatives by Blood, Adoption, and Association: Who Should Get What and Why,
 
 37 Vand. L. Rev. 711, 713-17 (1984). However, modern legal forms continue to recognize the traditional use of the “blood” restriction by defining “descendants” to include persons whose relationship to the designated ancestor is by blood
 
 or by adoption. See, e.g.,
 
 20A Am. Jur. Legal Forms 2d § 266:53, p. 370 (2009) (“Whenever used in this Will, the word “descendants” or the word “issue” shall mean legitimate descendants of whatever degree, including descendants both by blood and by adoption.”). Thus, by expanding the definition of “descendants” to include adoptees, adopted persons may be included within the terms of class gifts to descendants.
 

 The Trustees’ expansive reading of Article XVIII’s restriction of the trusts’ class gifts to “descendants by blood” as requiring genetic testing to determine membership in the class ignores the lessons of legal history. Because the blood restriction came to be used in wills and trusts to exclude adoptees from class gifts long before genetic testing became available, the meaning of these old expressions cannot
 
 *900
 
 reasonably be extended beyond the exclusion of adopted persons to disqualify descendants such as Catherine who were not adopted and who would otherwise qualify as a beneficiary of the class gifts but who happen to lack the requisite genetic profile from the settlors.
 
 [5]
 
 Thus a proper interpretation of the limitation of the trusts’ class gifts to “only children and descendants by blood” does not support the Trustees’ argument.
 
 [6]
 

 To put it in a nutshell, the trusts’ Article XVIII appears in legal instruments, not in a technical paper on genetics. The phrase “descendants by blood” is a legal term of art, not a scientific one. As a legitimate child of one of the settlors’ sons, Catherine qualifies as one of the settlors’ “descendants by blood.”
 

 IV. CONCLUSION
 

 In closing, we disagree with the Trustees that this case is about the set-tlors’ freedom to dispose of their property as they see fit. We need not decide whether the settlors could have restricted the class gifts in the trusts to descendants whose genetic profile reflected a biological connection to them. We merely hold that the restriction of the class gifts to “only children and descendants by blood” was not effective to accomplish such a result.
 

 We also observe that there is absolutely no indication in the trusts or otherwise that the settlors intended to exclude Catherine — or persons in a similar situation— as beneficiaries under the trusts’ class gifts. Article XVIII — with its boilerplate restricting the class gifts to blood descendants — was in the trusts for many years before the original DNA testing occurred in 1999. In the third amendment to the trusts made in 1992, the settlors refer to Catherine by name as one of their grandchildren. In a fourth amendment to her trust made in 1996, Eleanor describes Catherine as the “child” of her son, Chester III. Eleanor did not make any changes to her trust after the 1999 DNA testing. Thus the Trustees did not make any record showing that the settlors intended to exclude Catherine or other persons similarly situated as beneficiaries of the class gifts.
 

 Because Catherine is the legitimate child of her legal father, Chester III, she is, by operation of law, the “blood issue” of Chester III. It follows that she is a “descendant by blood” of the settlors and is within the class of persons entitled to take under the trusts. To paraphrase what another court said in a case involving similar facts, Catherine cannot be Chester Ill’s daughter for only some purposes.
 
 See In re Trust Created by Agreement
 
 
 *901
 

 Dated Dec. 20, 1961,
 
 166 N.J. 340, 765 A.2d 746, 759 (2001). Thus the circuit court erred as a matter of law in determining that Catherine was not a “descendant by blood” of Chester Jr. and Eleanor.
 

 For these reasons, we reverse the circuit court’s summary judgment in favor of the Trustees. Because the issue of Catherine’s status as a beneficiary of the trusts’ class gifts was the only issue raised in the Trustees’ complaint and motion for summary judgment and because there are no issues of material fact remaining for consideration below, we remand with directions to the trial court to enter a summary judgment in favor of Catherine.
 
 See State Fam Mut. Auto. Ins. Co. v. Colon,
 
 880 So.2d 782, 784 (Fla. 2d DCA 2004).
 

 Reversed and remanded with directions.
 

 DAVIS, J., and GALLEN, THOMAS M., Associate Senior Judge, Concur.
 

 [1]
 

 . The names of the parties and the other persons mentioned in the caption and in the recitation of the facts of this case are fictitious. We use fictitious names in this opinion to protect the privacy of the individuals involved.
 

 [2]
 

 . The 1999 DNA testing was not performed under a court order. Our record does not disclose what motivated Chester III to investigate whether he was Catherine's biological father at this relatively late date. Catherine asserts that she was tricked into submitting to the testing.
 

 [3]
 

 . Catherine did not seek review by certiorari of the circuit court order directing her to submit to further DNA testing. Moreover, Catherine has not challenged the propriety of that order on this appeal. In any event, the testing order is moot. The testing has already occurred, and the results have been disclosed to the parties and to the court. For these reasons, we express no opinion on the propriety of the circuit court's order for compulsory DNA testing.
 
 Cf. Contino v. Estate of Contino,
 
 714 So.2d 1210, 1214 (Fla. 3d DCA 1998) (holding that the personal representative of an intestate estate was not entitled to an order for the DNA testing of a child bom into wedlock to establish whether the decedent was the child's biological father).
 

 [4]
 

 . The opinion suggests that William and Mar-celle were United States citizens living in Paris.
 

 [5]
 

 . In an order for supplemental briefing issued in this case, we asked the parties to inform us if the language restricting a class gift to "only children and descendants by blood” or similar expressions had ever been applied to bar a person such as Catherine who was bom in wedlock from taking under a class gift in a will or trust in any reported decision in the United States. The parties informed us that they were unable to locate any such reported decision. Our independent research has reached the same result. The absence of such reported decisions lends weight to our conclusion that the Trustees’ argument misapplies Article XVIII's restriction of the class gifts to blood descendants.
 

 [6]
 

 . The Trustees' insistence that we need look no further than biological fatherhood to interpret the restriction of the trusts’ class gifts to blood descendants would lead to difficulties in an analogous factual situation. If Catherine had been conceived by artificial insemination from sperm donated by a third party, then Chester III would not be her biological father. But provided that both Chester III and Catherine’s mother had consented in writing to the artificial insemination, Catherine would be irrebuttably presumed to be Chester Ill's child.
 
 See
 
 § 742.11(1), Fla. Slat. (2008).