CONTINENTAL CASUALTY COMPANY, A CORPORATION, *Plaintiff in Error*, v. CHARLES H. BOWS, *Defendant in Error*.

## Opinion Filed June 20, 1916.

1. In an action at law instituted by the insured against an insurance company upon an accident insurance policy which provides an indemnity in the sum of $500.00 "For loss of either hand by complete severance at or above the wrist," the insured is not entitled to a recovery under such provision, when the evidence adduced fails to show a complete severance of the hand at or above the wrist, even though it may establish that the small portion of the hand so left was practically of no use or service to the insured.

2. All parties who are *sui juris*, including insurance companies and persons having property insured as well as others, in the eyes of the law, before the court, stand upon an equal footing, entitled to equal rights and protection, and none to special privileges. All parties are free to make whatever contracts they please, so long as no fraud or deception is practiced and the contract is legal in all respects.

3. Parties are bound by the contracts they make, when the same are legal, and it is the duty of the courts to construe and enforce contracts, not to make or change them.

Writ of Error to Circuit Court, Duval County; Daniel Simmons, Judge.

Judgment reversed.

*Ellis, J.,* dissenting as to the insufficinecy of evidence to show a complete severance of the hand.

*Cockrell & Cockrell* and *George R. Sanderson,* for Plaintiff in Error;

*J. W. Holland,* for Defendant in Error.

SHACKLEFORD, J.—The Continental Casualty Company, a corporation, issued an accident insurance policy to Charles H. Bows which contained a provision to the effect that such insurance company would pay to the insured the sum of $500.00 "For loss of either hand by complete severance at or above the wrist." No point is made on the pleadings. It is sufficient to state that Bows brought an action at law upon the policy against the company for the loss of his left hand, his declaration consisting of two counts, to which the defendant company filed its pleas, and subsequently the plaintiff filed replications and the defendant filed a rejoinder, the issue submitted to the jury thereby being as to whether or not the plaintiff was entitled to recover upon the proofs adduced for the loss of his hand upon the provision in the policy which we have copied above. At the close of the plaintiff's testimony, the defendant moved the court to instruct the jury to find a verdict for the defendant, which motion the court denied, whereupon the defendant announced that it had no testimony to offer and the plaintiff then moved that the jury be instructed to find a verdict for the plain-

tiff, which motion was granted and the jury returned a verdict in favor of the plaintiff and against the defendant for the sum of $500.00, together with interest, for which amount judgment was rendered, which judgment the defendant has brought here for review. Several errors are assigned, but, as is stated by the defendant in its brief, in which the plaintiff practically acquiesces, the only question presented for determination is whether the plaintiff, under the undisputed testimony, was entitled to recover upon the provision in the policy which we have copied above. We see no occasion for setting forth any of the testimony introduced by the plaintiff, except that of Dr. R. L. Harris, which is as follows:

"My residence is in Jacksonville, Florida. I have lived in the State of Florida since 86. I have been engaged in the practice of medicine since 1882. I also practice surgery. I know the plaintiff Charles Bows, and on or about January 30, 1914, I treated him for an injured hand which he had. When I first saw him the hand was crushed, right across the palm. I don't remember the exact condition. I don't remember whether the fingers were attached or not, but probably severed, crushed right across. The hand was crushed across the region of the metacarpal bones crushing to a pulp all tissues, involving a large part of the muscles of the thumb. The entire hand was crushed. · I don't remember about the phalanges, whether they were crushed or not, but I do remember that the hand was destroyed beyond all hope—it was just simply a matter of finishing the crush, probably crushed off, I don't remember. I am inclined to think it was practically severed. The car wheels passed over them. The metacarpal bones are above the knuckle joint, they extend from the base of the fingers to the carpal bones which are the small bones of the wrist. I am not

positive whether I performed the surgical operation on this injured hand myself or had my assistant do it. I supervised it and am a little inclined to think that I had my assistant do it and I was present and had my gloves on and did part of it. The surgical work which was done was this: the ends of the metacarpal bones, the ends were disjointed, removed at the wrist joint, removing the entire hand. It left the thumb sticking out setting away out. It other words, after removing the ends of these bones I left the thumb sticking out so far that there was no place to get the muscles of the thumb attached to anything. In order to get the thumb back where it could get some attachment for the muscles one bone of the wrist was taken, the pisiform, that was removed so the thumb could be set further back to bring these muscles down so as to get an attachment for the muscles, so as to give him some use of the thumb, otherwise the thumb would have set out and had no use of it, but all the hand bones were removed at the wrist joint that is across at the junction of the metacarpal and carpal bones, and one carpal bone was removed in order to set the thumb back and get attachment for the muscles so as to give him some use of the thumb. There was not sufficient tissues left to cover this stump. In other words, to make what we call a complete amputation we would have had to have gone above the wrist, could not leave anything to give enough to cover it, but we took chances on a good union by granulation, so as to save the thumb and succeeded. It was a question at the time whether the thumb would not have to come off owing to the fact that there was so little tissue attached to save the stump. We took chances, but it healed over by granulation and he has a thumb left. We had to take out a wrist bone, the trapezium that this bone sets on. When everything was taken off down to that it left it set-

ting out on the point, isolated, so much so that the crush being as it was it left the ends of these muscles so you could not bring them down and attach them to anything. This block of bone was taken out in order to set the bone back and the muscle down where you could get an attachment for them. It was simply setting the thumb back the thickness of that block of bone called the trapezium. If healing by granulation had failed and left the bone exposed the probabilities would have been to take it off above all bones of the wrist entirely and after the operation Bows made visits to my office in regard to healing and I cared for him afterwards. I have seen this hand this morning and its present condition is the result of the crush and the operation that I have performed.

### CROSS EXAMINATION.

"His left thumb is left. I saved it on the theory that it would give some benefit to him and I consider that it is of some benefit to him. A very little, very little, of the flesh of the hand other than the thumb remained. With reference to the skin of the hand, including the thumb hanging below the wrist there was practically none cut off above where it was crushed off. It was simply trimmed up, smoothed up and there was not enough to sew to, bring over, to make what we call a finished operation. In other words, it was practically left open from the fact the skin and tissues were crushed off almost on a line with where the metacarpal bones were removed. There was very little skin of the hand left. There was some of the skin left that naturally belonged over the upper part of the metacarpal bones. The metacarpal bones are bones of the hand and not of the wrist. Some of that skin was left. Part of it was cut off. There was very little left. It was

just smoothed off. There was some left. The ends of the tissues, the tendons, ligaments, etc., probably a small amount of this left below the lower end of the carpal bones. Excluding any consideration of the thumb there was a small amount of skin and tissues and tendons left below the carpal bones. The carpal bones I consider the wrist bones. They are the junction between the arm and the hand. Some of the flesh was left hanging below the wrist bones.

"Q. So that excluding any consideration of the thumb the hand was not completely severed but was only completely severed below the wrist. A. From a surgical standpoint when we speak of amputation we always refer to the bone where the bone is severed and not where the tissue is severed. Where the tissue is severed from a surgical standpoint has no connection with the point of amputation. The point of amputation is the only thing considered where amputation is performed. Q. I gather that, but I also gather, speaking now, not from a surgical standpoint, but from an absolute standpoint of facts, some part of the hand, whether of bone or muscle or tendon or what not, some part of the hand exclusive of the thumb was left below the wrist. A. Yes sir. Q. As I understand in addition to these other things the thumb was also left? A. Yes.

### REDIRECT EXAMINATION.

"To make the last answers clear I would say that any amputation is a joint, for instance at the elbow you would naturally use a part of the forearm to cover the bone. An amputation at the knee you would naturally use a part of the leg below the knee to cover the end of the joint. Amputation at the wrist you would naturally use a part of

the tissues below the wrist to cover the point of amputation. It could not be amputated at those points without using something below the point of amputation. Speaking of a bone always it is universally conceded as being the point when you speak of amputation where it is performed. Q. In other words, Doctor, in removing the metacarpal bones which had been crushed there was some skin and tissues that was left which had covered them. Is that a fact and you used that in binding over this amputation at the wrist, is that a fact? A. Well, we cut off a portion of the tissue that was destroyed and left the tissue that would probably granulate, that would probably become healthy. In doing that there was not enough left to close over the end and make a complete job. Q. So that all this tissue and skin you speak of being left on the hand? A. There was not sufficient to bring together and close up completely. There was only enough left to bring together and taking the chance of granulation and saving the thumb."

Was there such a severance of the plaintiff's hand as to entitle him to recover upon the contract made by him and the defendant company? We have several times held that all parties who are *sui juris* are free to make whatever contracts they please, so long as no fraud or deception is practiced and the contract is legal in all respects, and the fact that one of the parties made a rather hard bargain would not avoid the contract. We further held that all parties litigant who are *sui juris,* including insurance companies, stand upon an equal footing, in the eyes of the law, before the courts, entitled to equal rights and protection, and none to special privileges. See Southern Home Insurance Company v. Putnal, 57 Fla. 199, 49 South. Rep. 922, and authorities therein cited, especially Scotch Manufacturing Co. v. Carr, 53 Fla. 480, 43 South.

Rep. 427. To the like effect is Georgia Home Insurance Co. v. Hoskins, 71 Fla. 282, 71 South. Rep. 285. Also see our discussion in Preferred Accident Insurance Co. v. Robinson, 45 Fla. 525, 33 South. Rep. 1005, 3 Ann. Cas. 931. It will be observed that the provision in the policy upon which the liability of the defendant company to the plaintiff is based is for the loss of a hand "by complete severance at or above the wrist." We are of the opinion that the testimony not only fails to show such "*complete* severance" of the plaintiff's hand "at or above the wrist," but, on the contrary, shows that there was not such complete severance, therefore, since the parties are bound by their contract, and it is the duty of the courts to construe and enforce contracts, not to make or change them, there can be no recovery. See Wiest v. United States Health & Accident Insurance Co., 186 Mo. App. 22, 171 S. W. Rep. 570; Brotherhood of Railway Trainmen v. Walsh, 89 Ohio St. 15, 103 N E. Rep. 759; Newman v. Standard Accident Insurance Co., — Mo. App. —, 177 S. W. Rep. 803. Other authorities will be found cited in these opinions, number of which we have examined, as well as still other authorities, but do not deem it necessary to discuss them. We would refer to Fuller v. Locomotive Engineers' Mutual Life & Accident Insurance Association, 122 Mich. 548, 81 N. W. Rep. 326, 80 Amer. St. Rep. 598; 1 C. J. 467; Fuller's Accident and Employers' Liability Insurance, 351, *et seq.* The language used in the provision of the policy now under consideration is not uncertain or ambiguous and there would seem to be no doubt as to what was intended thereby. It

will be readily observed that it does not state for the loss of the *use* of the hand, but for a *"complete* severance."

The judgment must be reversed.

TAYLOR, C. J., and WHITFIELD, J., concur.

ELLIS, J., dissents.

COCKRELL, J., takes no part.