32 So.3d 682 (2010)
Kimberly M. HALL, Mother, Appellant/Cross-Appellee,
v.
Roberto R. MAAL, Father, Appellee/Cross-Appellant.
No. 1D08-4776.
District Court of Appeal of Florida, First District.
March 30, 2010.
Rehearing Denied April 29, 2010.
*683 John L. Myrick, Pensacola, for Appellant/Cross-Appellee.
Gregory D. Smith, Pensacola, for Appellee/Cross-Appellant.
EN BANC
ROBERTS, J.
Appellee, Roberto Maal, moves for rehearing en banc with regard to this court's determination that a valid marriage existed between him and appellant, Kimberly Hall. We grant the motion for rehearing en banc on this issue, withdraw the opinion of the court, Hall v. Maal, 34 Fla. L. Weekly D2152 (Fla. 1st DCA Oct.20, 2009), and substitute the following in its place.
Ms. Hall and Dr. Maal were engaged to be married on March 2, 2002, at Old Christ Church in Pensacola. Leading up to their wedding date, they went through many of the familiar activities of those who intend to marry. They arranged for the church, engaged a minister, sent out invitations, arranged for flowers and a photographer, and attended pre-marital counseling. They attended at least two wedding showers. And, as some couples do, they started to work out a pre-nuptial agreement.
The week before the wedding, the couple was scheduled to go to the office of the county court clerk to get a marriage license. However, on that day, Dr. Maal called Ms. Hall at work and told her that they were not going to be able to get a marriage license because they had not agreed on the pre-nuptial agreement. Ms. *684 Hall was understandably upset by thisall of the arrangements had been made and many of the guests were already in Pensacola for the ceremony. Dr. Maal persuaded her to go ahead with the ceremony, reassuring her that "everything will be alright." On March 2, 2002, Dr. Maal and Ms. Hall participated in a full wedding ceremony performed by a minister at the church with numerous family members and friends present, complete with attendants, music, and flowers, and followed by a very nice reception. They did this knowing that they had not ever applied for nor received a marriage license.
In the years following the 2002 ceremony, two children were born of the relationship, Dr. Maal referred to Ms. Hall as his "wife," and she referred to him as her "husband." The mortgage on the parties' home referred to them as "husband and wife." Ms. Hall was referred to as "Mrs. Maal" in her workplace, although she had not legally changed her name. The parties continued to file separate tax returns.
A year after the "marriage" ceremony, the parties appeared before the clerk of the court and applied for and received a marriage license. However, the license was neither solemnized nor returned to the clerk of the court to be made part of the official records of the county.
On April 18, 2006, Ms. Hall filed a petition for dissolution of marriage. Dr. Maal responded by filing an answer and counter-petition to establish paternity, wherein he denied the existence of a valid marital relationship. Ms. Hall then filed a "Motion Requesting Judicial Determination of a Valid Marital Relationship." The court held a hearing on the motion, finding that a valid marital relationship did not exist.
In this appeal, Hall argues that the trial court erred in ruling that the lack of a marriage license was fatal to the existence of a legally cognizable marriage.
Since 1967, when the Florida legislature abolished common law marriage, there has been only one method of producing a legally cognizable marriage in Florida. See generally §§ 741.01-.212, Fla. Stat. (2002). Persons desiring to be married are required to apply for a marriage license which can be issued by a county court judge or the clerk of the circuit court. See § 741.01, Fla. Stat. (2002). After issuance, a license is valid for 60 days within which time the marriage must be solemnized. See § 741.041, Fla. Stat. (2002). Marriage may be solemnized by ordained clergy, judges, clerks of court, or notaries public. See § 741.07, Fla. Stat. (2002). After solemnization, the officiant shall certify on the license that the marriage has been performed and deliver it, within 10 days, to the clerk or judge that issued it. See § 741.08, Fla. Stat. (2002). The county court judge and the clerk of the circuit court are required to keep a correct record of all licenses issued and of the licenses returned as certified by the officiant. See § 741.09, Fla. Stat. (2002). There are also provisions for proving up a marriage when the certificate is not completed on the marriage license, when the certified license is lost or when death or other cause prevents a certificate from being made. See § 741.10, Fla. Stat. (2002).
Section 741.08, Florida Statutes (2002), provides:
Marriage not to be solemnized without a license.Before any of the persons named in s. 741.07 shall solemnize any marriage, he or she shall require of the parties a marriage license issued according to the requirements of s. 741.01, and within 10 days after solemnizing the marriage he or she shall make a certificate thereof on the marriage license, and shall transmit the same to the office of the county court judge or *685 clerk of the circuit court from which it issued.
There are two cases which examine this section. The first case, In re: Estate of Litzky, 296 So.2d 638 (Fla. 3d DCA 1974), is indistinguishable from the case before us. Rose Litzky, a/k/a Rose Zyontz, married Isaac Litzky in an Orthodox Jewish ceremony officiated by an Orthodox Rabbi and the couple was issued a "Ksuba," a Hebrew marriage certificate, by the Rabbi. Mr. Litzky died five months later and Ms. Litzky filed a notice of election to take dower. The court referenced part of section 741.211, which eliminated common law marriage and states, "nothing contained in this section shall affect any marriage which, though otherwise defective, was entered into by the party asserting such marriage in good faith and substantial compliance with this chapter." Id. at 639 (emphasis added). The court ruled that the parties were never legally married stating:
We are in accord with the able probate judge's opinion that the law of Florida now provides for only one kind of marriage, one which is entered into by the parties in good faith and in substantial compliance with Chapter 741.
Id.
In Metropolitan Dade County v. Shelton, 375 So.2d 32 (Fla. 4th DCA 1979), a couple who sought to be married applied for a license on a Wednesday. However, because a three-day waiting period applied, the license could not be issued until the following Monday. When the couple informed the deputy clerk of court that the ceremony was scheduled for that Friday, the deputy clerk assured them that it would be legal to perform the ceremony on Friday and have the license issued the following Monday. The deputy clerk went so far as to call the notary to provide assurance of the validity of this procedure. The couple had a marriage ceremony on Friday before the notary and other witnesses and then executed the newly issued marriage license in the office of the clerk of court with the notary and the same witnesses present the following Monday.
The Shelton court, while invited by Dade County to declare that ceremonial marriage without a marriage license results in a valid marriage, ruled more narrowly. In applying the "good faith and substantial compliance" test from section 741.211 first applied in Litzky, the court found that the parties acted in good faith in attempting to comply with the statute because "[b]oth of them intended to enter into a valid marriage and both assumed that the licensing procedure suggested by the clerk was valid." Id. at 33.[1]
The Fifth District addressed a similar set of facts under Oregon law. In Preure v. Benhadj-Djillali, 15 So.3d 877 (Fla. 5th DCA 2009), the parties participated in a religious ceremony in Oregon, but did not apply for nor obtain a marriage license. Ms. Preure claimed that there was a valid marital relationship, although she admitted that a marriage license is required in Oregon for a lawful marriage to exist. She relied on section 106.150(2) of the Oregon revised statutes, which provided that all marriages not affected by legal impediments that are solemnized in a religious ceremony are valid. However, the court *686 determined that the additional statement in section 106.150(2), which provided that the person presiding over the ceremony shall deliver the marriage license to the county clerk who issued the license, presupposed the existence of a marriage license and that the savings clause relied on by Ms. Preure was inapplicable. Therefore, the court found that there was no valid marital relationship under Oregon law. Thus, a much broader savings clause than the one that exists under section 741.211, Florida Statutes (2002), was held not to apply because an in pari materia reading of the marriage statutes demonstrated that a license was needed to be married.
Florida's marriage statute must be read in pari materia. Couples who desire to be married must apply for a license. There is a fee for getting a marriage license and that fee is reduced for attending pre-marital counseling. The license is valid for 60 days. The officiant at the ceremony must certify that the marriage was solemnized. The certified marriage license must be returned to the clerk or issuing judge within 10 days and the clerk or judge is required to keep a correct record of certified marriage licenses. Finally, there is a provision by which the marriage may be proved in instances where the license is lost or destroyed. At every turn in Chapter 741, marriages are presupposed to have a license. To depart from the requirement to have a license re-creates common-law marriage as abolished by section 741.211.
In the case before us, the parties did not proceed in good faith. "Good faith" is defined as "an honest belief.... Honesty of intention, and freedom from knowledge of circumstances which ought to put the holder on inquiry.... [It] describe[s] that state of mind denoting honesty of purpose ... and, generally speaking means being faithful to one's duty or obligation." The Fla. Bar v. Jackson, 494 So.2d 206 (Fla.1986) (quoting BLACK'S LAW DICTIONARY 623-24 (5th ed. 1979)). The testimony in the record demonstrates that both Dr. Maal and Ms. Hall were aware that to become married in Florida they were required to appear before the clerk of the court together and apply for and receive a marriage license. Furthermore, the parties applied for and received a license to marry a year after the ceremony at issue here. That license was neither solemnized nor returned to the clerk to become part of the official records of the county. This subsequent act of applying for a license demonstrates that Dr. Maal and Ms. Hall were well aware that their original wedding ceremony did not produce a marriage under Florida law. Although there is little doubt that Ms. Hall genuinely wanted to be married, she could not have reasonably believed she achieved that aim after engaging in a wedding ceremony in full knowledge that neither she nor Dr. Maal had ever applied for a marriage license. A distinction needs to be made between sincerely desiring to be married and attempting in good faith to go through the steps that will result in a legally cognizable marriage.
The parties were not in substantial compliance with Chapter 741. Whether substantial compliance exists is a fact-based inquiry. However, in order for there to be substantial compliance, there has to be some compliance. Some compliance would, at a minimum, entail the parties applying for and receiving a license.
The dissent compares the lack of a marriage license to an unrecorded deed and points out that failure to record a deed does not make invalid the transfer of land. This analogy would work if Ms. Hall and Dr. Maal had actually received a license, gone through a ceremony, and then failed *687 to return the certified license to the clerk of court. The facts before us are more analogous to a situation in which the parties are in negotiation for the purchase of land and reach agreement on a wide range of the terms of the sale yet cannot reach agreement on one final and material term. Therefore, no deed is executed and no sale is made.
The dissent also relies on the canon of expressio unius est exclusio alterius, reasoning that the legislature has explicitly made invalid same-sex and incestuous marriages and therefore did not intend to make invalid marriages that occur without the benefit of a license. The legislature has clearly provided that same-sex marriages are invalid, stating that they "are not recognized for any purpose in this state." § 741.212(1), Fla. Stat. (2002). However, with regard to incestuous marriages, the statute provides that people in certain familial relationships "may not marry." § 741.211, Fla. Stat. (2002). This language prohibits a marriage from occurring rather than nullifying one that has occurred much like the language of section 741.08, which the dissent finds to be merely regulatory.
To the extent that the dissent would hold that a marriage ceremony without a license, coupled with living together and "acting married," results in a valid marriage, it would recreate a species of common-law marriage in violation of section 741.211, Florida Statutes (2002). If the dissent asserts that Ms. Hall entered a technically defective marriage "in good faith and in substantial compliance" with Chapter 741, the record demonstrates otherwise.
Accordingly, the judgment of the trial court is AFFIRMED.
WOLF, WEBSTER, BENTON, PADOVANO, LEWIS, CLARK, and ROWE, JJ., concur.
WETHERELL, J., concurs in part and dissents in part in an opinion with which HAWKES, C.J., DAVIS and MARSTILLER, JJ., concur.
THOMAS, J., dissents in an opinion with which KAHN, J., concurs.
KAHN, J., dissents in an opinion with which THOMAS, J., concurs.
VAN NORTWICK, J., recused.
WETHERELL, J., concurring in part and dissenting in part.
I concur in the decision to affirm the trial court's determination that the parties did not have a valid marriage for the reasons stated in the en banc majority opinion, but I respectfully dissent from the decision to affirm trial court's ruling on the child support issue raised in the cross-appeal.[2] I would reverse that issue and remand for the trial court to conduct the accounting agreed to by the parties and expressly provided for in the Temporary Order entered at the outset of this case.
Two children were born to the parties during their relationship. It is undisputed that Dr. Maal is the biological father of these children and that he has a legal duty to provide support for them. The parties agreed to shared parental responsibility, with Ms. Hall having primary residential custody of the children.
*688 The petition for dissolution of marriage filed by Ms. Hall in April 2006 sought an award of child support. The counter-petition to establish paternity filed by Dr. Maal in response to the petition for dissolution likewise requested that the trial court establish child support in accordance with the statutory guidelines.
On October 20, 2006, pursuant to the agreement of the parties, the trial court entered a Temporary Order that included the following provisions concerning child support:
3. As for child support, the Respondent [Dr. Maal] shall pay to the Petitioner [Ms. Hall] the sum of $5,000 per month commencing on October 1, 2006 and on the first of every month thereafter until further order of this Court.
4. The parties acknowledge that the said child support probably exceeds the to-be-determined guidelines support amount. The parties further acknowledge that there may be arrearage due since the actual date of filing. The Court reserves jurisdiction in order to effect necessary adjustments as far as support payable is concerned should either party be entitled to credit for any overpayment and/or underpayment of child support payable. This Court does find that the Respondent has paid as child support the sum of $1,750 per month for the period May through September 2006. (emphasis added)
On October 22, 2007, after a hearing, the trial court entered a Temporary Order on Child Support and Visitation. This second temporary order modified Dr. Maal's child support obligation effective November 1, 2007, to $3,528 per month, which was comprised of $2,528 per month in guideline support and an additional $1,000 per month for speech therapy for one of the children.[3]
The Final Judgment of Paternity entered by the trial court on September 2, 2008, modified Dr. Maal's child support obligation to $2,807 per month in guideline support and up to an additional $1,000 per month for speech therapy. The final judgment denied Dr. Maal's request for reimbursement of any alleged child support overpayments without conducting the accounting required by the initial temporary order to determine whether "either party [was] entitled to credit for any overpayment and/or underpayment of child support." The sole basis for the denial was the trial court's finding that "the amounts paid by [Dr. Maal] were pursuant to a Stipulated Agreement entered into between the parties, and, as such, he is not entitled to reimbursement of any amounts paid in accordance with that Stipulated Agreement."
In his cross-appeal, Dr. Maal does not challenge the amount of the child support obligation established in the final judgment. He only challenges the trial court's denial of his request for reimbursement of the child support he allegedly overpaid pursuant to the initial temporary order.
The abuse of discretion standard typically applies to our review of a trial court's award of child support. See Shaw v. Nelson, 4 So.3d 740, 742 (Fla. 1st DCA 2009). However, in my view, the de novo standard of review applies to our review of the child support issue in this case because the trial court's denial of Dr. Maal's request for reimbursement was not based upon an exercise of judicial discretion, but rather was based upon the trial court's apparent *689 misinterpretation of, or failure to follow, the initial temporary order entered pursuant to the agreement of the parties. See Canakaris v. Canakaris, 382 So.2d 1197, 1202 (Fla.1980) (recognizing that the abuse of discretion standard does not apply where the appellate court is reviewing the trial court's alleged failure to apply the correct legal rule); see also Avellone v. Avellone, 951 So.2d 80, 83 (Fla. 1st DCA 2007) (applying the de novo standard when reviewing the trial court's interpretation of a marital settlement agreement incorporated into the final judgment).
As noted above, the trial court found that Dr. Maal was not entitled to reimbursement of any child support overpayments solely because the payments were made pursuant to an agreement of the parties. Although not cited by the trial court or Ms. Hall, there is case law that stands for the proposition that a parent is not entitled to reimbursement of excess child support that is paid voluntarily without an expectation that it is a loan that will have to be repaid. See, e.g., Martinez v. Martinez, 383 So.2d 1153, 1155-56 (Fla. 3d DCA 1980). In this case, however, the "voluntary" nature of the overpayments is not determinative because the parties expressly agreed that the trial court would conduct an accounting to determine whether "either party [was] entitled to credit for any overpayment and/or underpayment of child support."
In my view, the trial court erred as a matter of law by failing to conduct the accounting agreed to by the parties and required by the initial temporary order. Alternatively, if the abuse of discretion standard applied, I would conclude that the trial court abused its discretion by failing to exercise it as contemplated by the initial temporary order. See V.F.D. v. State, 19 So.3d 1172, 1175 (Fla. 1st DCA 2009) ("The trial court abused its discretion by not hearing evidence and exercising its discretion based on the facts and circumstances of [the] case.").
The child support payments made by Dr. Maal pursuant to the initial temporary order were not vested rights/obligations that could not be retroactively modified as was suggested in the original panel opinion. See 34 Fla. L. Weekly at D2154 (quoting Waldman v. Waldman, 612 So.2d 703, 704 (Fla. 3d DCA 1993)). First, the payments were made pursuant to a temporary order, not a final judgment as was the case in Waldman. Second, in this case, the trial court expressly reserved jurisdiction in the initial temporary order to conduct an accounting to determine whether one of the parties was due a credit based upon an overpayment or underpayment of support. Third, our sister courts have consistently rejected the proposition that temporary support orders establish vested rights that are not subject to retroactive adjustment. See, e.g., Ghay v. Ghay, 954 So.2d 1186, 1190 (Fla. 2d DCA 2007); Roberts v. Roberts, 906 So.2d 1193 (Fla. 4th DCA 2005); Flores v. Flores, 874 So.2d 1211, 1212 (Fla. 4th DCA 2004); Dent v. Dent, 851 So.2d 819, 820-21 (Fla. 2d DCA 2003).
The record supports Dr. Maal's claim that he overpaid child support pursuant to the initial temporary order and that he was therefore entitled to a credit in some amount. Dr. Maal presented evidence at the final hearing that he overpaid $19,006 in child support between October 2006 and October 2007, but my rough calculations suggest that the amount of credit that he is due is significantly less.[4] However, *690 without any findings from the trial court based upon the accounting contemplated by the initial temporary order, we are unable to properly review this issue. Remanding the child support issue to the trial court would allow it to make the necessary findings.
I recognize that trial courts have broad discretion in family law matters concerning child support and the best interest of the children. However, this broad discretion does not give the trial court free reign to ignore the parties' agreement and the requirements of its prior order simply to reach a decision that might be viewed by some as "equitable" to Ms. Hall under the circumstances.
In my view, there is nothing unusual or inequitable in the approach agreed to by the parties and adopted by the trial court in its initial temporary order concerning child support. See Dent, 851 So.2d at 821-22 (Stringer, J., concurring specially) (explaining that "[a] temporary support order is often required at the beginning of the dissolution action, before the parties have had an opportunity to complete discovery" and that "[a]s the case progresses, the developing evidence or changes in the parties' financial circumstances may reveal inequities or errors in the prior support awards that require adjustment in the final analysis"). The accounting agreed to by the parties must be viewed in context of the entire agreement, the apparent purpose and clear effect of which was to ensure that the children promptly received support, rather than delaying the child support payments to Ms. Hall while the parties bickered over the precise amount of support that should be paid. This type of approach should be encouraged, but the only way to do so is by requiring the trial court to give full effect to the parties' agreement by conducting the accounting agreed to by the parties.
That said, I recognize the perceived unfairness of a decision requiring Ms. Hall to reimburse Dr. Maal for child support that he paid pursuant to the initial temporary order, particularly where one of the children has special needs and the validity of marriage issue is being resolved against Ms. Hall. However, that is what the parties agreed to, and I am confident that the trial court would be able to craft an equitable remedy if, as it appears, Dr. Maal overpaid child support and is entitled to reimbursement under the terms of the parties' agreement.
For these reasons, I respectfully dissent from the decision to affirm the child support issue. In all other respects, I fully concur in the en banc majority opinion.
THOMAS, J. Dissenting.
I respectfully dissent from the majority's decision on the merits, but I agree that this is a case of great public importance because "[m]arriage is one of the `basic civil rights of man,' fundamental to our very existence and survival." Loving v. Virginia, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (quoting Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942)).
In essence, the en banc majority opinion rewrites and condenses the relevant statutory sections to read: No couple who fails *691 to obtain a marriage license will be considered legally married, regardless of any legitimate evidence of marriage to the contrary. The majority's statute is clearer than the Legislature's statute, but the judicial branch is bound by the words voted on by the Legislature, which undisputedly does not contain the above sentence.
The Legislature's statute creates a factual question to determine whether a couple entered into a valid marriage "in good faith and in substantial compliance" with the entire statutory scheme. § 741.211, Fla. Stat. This is unlike any other licensing scheme regulating professional activities. The Legislature did not prohibit marriage without a license; instead, it created a type of registration to ensure certain criteria are met. The Legislature's statute is consistent with the recognition that a ceremonial marriage between an adult man and an adult woman unrelated by blood should not be rendered invalid merely because the couple did not obtain a governmental license.
Although Florida has abolished common-law marriage, it has not abolished unlicensed marriages. Should the State intend to do so, it must do so clearly and specifically. By its decision here, the majority has crafted a statute that proclaims that the parties, who engaged in a solemn, religious and public marriage ceremony, after receiving premarital counseling, are denied the fundamental right to be married. In addition, the couple's two children are now deemed to be born out of wedlock. This result is contrary to the strong presumption of legitimacy attached to children born in wedlock. Knauer v. Barnett, 360 So.2d 399, 403 (Fla.1978).
In addition, the majority fails to consider any equity that might be relevant to the factfinder and must be a consideration under chapter 61, Florida Statutes. The majority's new statute compels a court to countenance inequitable actions. Here, Appellee's inequitable conduct has deprived Appellant of the protections accorded spouses under the law.
The procedures for contracting a valid marriage in Florida are regulated by chapter 741, Florida Statutes. As stated in section 741.211, Florida Statutes, "No common-law marriage entered into after January 1, 1968, shall be valid, except that nothing contained in this section shall affect any marriage which, though otherwise defective, was entered into by the party asserting such marriage in good faith and in substantial compliance with this chapter." Nowhere in chapter 741 is it expressly stated that marriages conducted without a license are invalid or prohibited. In contrast, same-sex and incestuous marriages are prohibited. §§ 741.21, 741.212, Fla. Stat. (2002).
The Legislature is quite capable of writing a strict statute that prohibits an exception for unlicensed marriages. For example, unlicensed drivers, unlicensed lawyers, unlicensed doctors, and various other activities too numerous to mention are prohibited. See, e.g., §§ 322.03, 454.23, 458.327, Fla. Stat. In many of these examples an unlicensed person may incur criminal liability, and there is no defense for asserting "good faith" or "substantial compliance" with the relevant statutes.
A common-law marriage is defined as "`[a] marriage that takes legal effect, without license or ceremony, when a couple live together as husband and wife, intend to be married, and hold themselves out to others as a married couple.'" Lowe v. Broward County, 766 So.2d 1199, 1210-1211 (Fla. 4th DCA 2000) (emphasis added) (citing Black's Law Dictionary, 986 (7th ed. 1999). This case before us does not involve a common-law marriage; rather, in light of the public, solemn and religious *692 wedding ceremony, it involves an unlicensed marriage.
The absence of an express invalidation of unlicensed marriages may be considered an expression of legislative intent under the canon of statutory construction known as expressio unius est exclusio alterius. Prewitt Mgmt. Corp. v. Nikolits, 795 So.2d 1001, 1005 (Fla. 4th DCA 2001). This rule "requires that when a law expressly describes a particular situation where something should apply, an inference must be drawn that what is not included by specific reference was intended to be omitted or excluded." Id. Where the Legislature has not expressly prohibited or invalidated unlicensed marriages, we may not read such a prohibition or invalidation into Florida law. See, e.g., State v. Rife, 789 So.2d 288, 293-94 (Fla.2001) (holding that legislature did not expressly prohibit downward-departure sentences in cases involving a minor's consent to sexual activity, thus, courts have authority to impose such sentences).
Other state legislatures have expressly invalidated unlicensed marriages. See, e.g., In re Silverman's Estate, 94 N.J.Super. 189, 227 A.2d 519 (1967) (noting that legislature expressly set out to abolish common-law marriages and invalidate marriages that occur without a license by stating unequivocally that "no marriage ... `shall be valid unless the contracting parties have obtained a marriage license.'") (citing N.J. Stat. Ann. § 37:1-10); Dire v. Dire-Blodgett, 140 Idaho 777, 102 P.3d 1096, 1098 (2004) (holding that a marriage license is required for a valid marriage where the law expressly states, "Consent alone will not constitute marriage; it must be followed by the issuance of a license and a solemnization as authorized and provided by law."); Carabetta v. Carabetta, 182 Conn. 344, 438 A.2d 109, 111 (1980) (holding that a marriage solemnized by a religious ceremony without a license was not void where Connecticut Statutes states, "No persons shall be joined in marriage until both have joined in an application... for a license for such marriage," but also provides for only a fine for those who marry without obtaining a license and also that certain other marriages are void); but see Harlow v. Reliance Nat'l, 91 S.W.3d 243 (Tenn. 2002) (holding that party was not a surviving spouse and thus not entitled to death benefits under workers' compensation law because a marriage license was not obtained and Tennessee law provides that parties "shall" provide a license before being joined in marriage); Parks v. Martinson, 694 So.2d 1386, 1390 (Ala.Civ.App.1997) (holding that no valid statutory marriage occurred where parties did not obtain a license and statutory law required that "[n]o marriage shall be solemnized without a license.").
An unlicensed marriage is analogous to an unrecorded deed. "A deed is merely an instrument formally evidencing the transfer of an intangible title interest in and to land and when delivered it fulfills its purpose and is exhausted and remains only as evidence of the transfer that occurred." Cain & Bultman, Inc. v. Miss Sam, Inc., 409 So.2d 114, 120 n. 5 (Fla. 5th DCA 1982). An unrecorded deed does not indicate that there was no transfer of land. See Sasha & Sasha, Inc. v. Stardust Marine, S.A., 741 So.2d 558 (Fla. 4th DCA 1999) (holding that where a deed was unrecorded, the transfer of the land was deemed to have occurred just prior to commencement of action under the Uniform Fraudulent Transfer Act). Likewise, in my view, an unlicensed marriage does not indicate that a marriage did not occur; it indicates a lack of evidence of the marriage.
A solemnized marriage without a marriage license is not per se invalid under *693 Florida law, because the fundamental right of a man and woman to marry cannot be denied on the basis of ambiguous statutory language. "Once a marriage is shown to have been ceremonially entered into it is presumed to be legal and valid." Stewart v. Hampton, 506 So.2d 70, 71 (Fla. 5th DCA 1987) (citing Grace v. Grace, 162 So.2d 314 (Fla. 1st DCA 1964)). In addition, parties seeking to dissolve their marriage are not required to demonstrate the existence of a marriage license. § 61.052(7), Fla. Stat.; see, e.g., Cobo v. Sierralta, 13 So.3d 493, 496-98 (Fla. 3d DCA 2009) (quoting Stewart, 506 So.2d at 71, and Grace, 162 So.2d at 317, for the proposition that the party attacking a marriage's validity bears the burden of rebutting the presumption that the marriage is valid).
The absence of an express invalidation of unlicensed marriages, combined with the importance of marriage recognized in the law, demonstrates that unlicensed, ceremonial marriages are not facially invalid in Florida. While the regulation of marriage is within the purview of the legislative branch, should the Legislature intend to invalidate all unlicensed ceremonial marriages, then Florida's laws must expressly prohibit such unions. The majority's decision that an unlicensed marriage is invalid in all circumstances will have wide-sweeping ramifications, which should be carefully evaluated by the Legislature, and not decided by the judiciary.
A valid marriage affects confidential spousal communications, wrongful death, workers' compensation claims, and social security benefits. See, e.g., Blackburn for Blackburn v. Taylor, 566 So.2d 915 (Fla. 1st DCA 1990) (holding that claimant was a surviving spouse of the deceased and thus entitled to workers' compensation death benefits); Yokie v. State, 773 So.2d 115 (Fla. 4th DCA 2000) (holding that defendant's conversation with his spouse was protected by marital privilege); King v. Font Corp., 612 So.2d 662 (Fla. 2d DCA 1993) (holding that mother was the father's "surviving spouse" and thus entitled to an award of lost support and services under the Wrongful Death Act); Hisquierdo v. Hisquierdo, 439 U.S. 572, 575, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) (discussing spouse's entitlement benefits under the Social Security Act). Such a monumental decision declaring all unlicensed ceremonial marriages invalid is properly assigned to the Legislature under the separation of powers requirement of Article II, Section 3 of the Florida Constitution.
Thus, it follows that Appellant, the party asserting that she entered into a valid marriage in good faith and in substantial compliance with chapter 741, is entitled to an evidentiary hearing to prove her claim. It will then become Appellee's burden to overcome the strong presumption under the law that this solemn, religious and ceremonial marriage was valid ab initio.
A factfinder could determine that Appellant substantially complied with chapter 741 by taking part in premarital counseling, participating in a solemn marriage ceremony by an authorized minister, and entering into a marriage that is not common-law, same-sex, or incestuous in nature. See generally ch. 741, Fla. Stat. In addition, "proceedings under chapter 61 are in equity and governed by basic rules of fairness as opposed to the strict rule of law. The legislature has given trial judges wide leeway to work equity in chapter 61 proceedings." Rosen v. Rosen, 696 So.2d 697, 700 (Fla.1997) (internal citations omitted). Based on the facts of this case, it appears that Appellee may have unclean hands. Any equitable result would include a validation of the parties' marriage if it can be shown that Appellant entered into the marriage in good faith and in substantial compliance with chapter 741. The trial court, however, made no factual findings *694 regarding whether Appellant entered into the marriage in good faith. As such, a remand is required for the trial court to make such a determination.

Conclusion
Based on the foregoing, I would reverse the trial court's determination that a valid marital relationship did not exist, and remand for proceedings to determine whether Appellant entered the ceremonial marriage in good faith and in substantial compliance with chapter 741, Florida Statutes, and whether Appellee's inequitable conduct compels legal recognition of the marriage.
KAHN, J., dissenting.
I concur in all respects with Judge Thomas' dissent. I write to express a few additional thoughts concerning Ms. Hall's right to her day in court.
The majority appears to hold that Florida recognizes "only one method of producing a legally cognizable marriage...." Op. at 684. This cannot be true, though, because the very statute abolishing common-law marriage allows, as Judge Thomas has pointed out, recognition of any marriage entered into "in substantial compliance with this chapter." § 741.211, Fla. Stat. (2002). Substantial compliance seems to require a factual determination, and the present case has never proceeded beyond the motion stage.
I next note, in conjunction with Judge Thomas' observations, the statutory scheme concerning marriage licenses. To be sure, the Florida Statutes contain a section entitled "Marriage not to be solemnized without a license." § 741.08, Fla. Stat. (2002). Nevertheless, the text of that statute applies solely to a person authorized by section 741.07, Florida Statutes (2002), to solemnize the marriage. The provisions of subsection 741.08, including the directives to require a marriage license and transmit the license to the clerk's office, seek to control only the behavior of the officiant. Here, and without dispute, the minister did, although without untoward intent, default upon the statutory obligation. The officiant testified clearly that he had been affirmatively led to believe that Dr. Maal had a license but had left the license at home. The officiant further testified that if anything at all regarding the circumstances had given him the impression that the marriage was anything other than a formal and binding wedding ceremony, he "wouldn't have performed the ceremony." Because this statute sets out no positive obligation as to the couple engaging in the ceremony, I would not craft such a requirement.
The final point involves a traditional rule of contracts and the analogy of marriage to contracts. See Connor v. S.W. Fla. Reg'l Med. Ctr., Inc., 668 So.2d 175, 177 (Fla. 1995) (Overton, J. dissenting) (referring to "the legal obligations of the marriage contract"); Johnson v. Lincoln Square Props., Inc., 571 So.2d 541, 543 (Fla. 2d DCA 1990) (recognizing potential validity of out-of-state marriage because under Florida law, "validity of marriage is determined by the law of the state where the contract of marriage occurred"). Instead of concluding, as the majority does, that this couple did not proceed in good faith, a finder of fact might determine that it should examine the actual exchange of the vows, rather than any withheld, or subjective, but unexpressed, feelings. This is the way we construe contracts where the language is unambiguous:
In Stokes et al. v. Victory Land Company, 99 Fla. 795, 128 So. 408, Mr. Justice Ellis, speaking for the court, said: `The intention of the parties to a contract is to be deduced from the language employed by them. The terms of the contract, when unambiguous, are conclusive, in the absence of averment and proof of mistake, the question being, not what intention existed in the minds of the *695 parties, but what intention is expressed by the language used. Continental Casualty Co. v. Bows, 72 Fla. 17, 72 So. 278; Atlanta St. A.B.R. Co. v. Thomas, 60 Fla. 412, 53 So. 510.
Lyng v. Bugbee Distrib. Co., 133 Fla. 419, 182 So. 801, 802 (1938). A court is "guided first by the language of the contract itself and where the contract is clear and unambiguous there is no reason to go further." Lab. Corp. of Am. v. McKown, 829 So.2d 311, 313 (Fla. 5th DCA 2002). "In such a situation, the intent of the parties must be determined from only the four corners of the document, and not parol evidence." V & M Erectors, Inc. v. Middlesex Corp., 867 So.2d 1252, 1253-54 (Fla. 4th DCA 2004).
I am not persuaded, on the present facts, that the marriage license is part of the marital contract or that the absence of a license would, in every case, void the marital status. A marriage covenant, where not prohibited by law, is solemnized by the words and promises exchanged, and not by the license. I thus completely agree with Judge Thomas that an evidentiary hearing is in order.
NOTES
[1] The court in Shelton could have, and perhaps should have, reached the same result by holding that the parties were not in fact married on Friday when they had their marriage ceremony, but became married when they signed the license on Monday before a notary and the required witnesses. "Solemnization" under section 741.08 does not require any particular ceremony or the recitation of any particular words but only that the license is executed before the appropriate persons.
[2] The en banc opinion affirms the child support issue without discussion. The original panel opinion also affirmed this issue, holding that the trial court did not abuse its discretion in denying Dr. Maal reimbursement for alleged overpayments of child support because the payments were vested rights/obligations not subject to retroactive modification and because the payments were made voluntarily and were not considered a loan. See 34 Fla. L. Week at D2154.
[3] A subsequent order modified the child support obligation to a total of $3,854 per month, effective February 1, 2008. That modification has no bearing on the child support issue before us.
[4] Assuming no arrearage was due for any period prior to May 2006 (which was another fact the initial temporary order deferred resolution of), it appears to me that the overpayment was closer to $10,246. The petition for dissolution of marriage was filed in April 2006, and between May and September 2006, Dr. Maal appears to have underpaid child support in the amount of $8,890 because, according to the temporary order, he was paying only $1,750 per month when he should have been paying $3,528 per month. But, between October 2006 and October 2007, Dr. Maal appears to have overpaid support in the amount of $19,136 because he was paying $5,000 per month pursuant to the temporary order when he should have only been paying $3,528 per month.